Z. M. HANCOCK ET AL. *v.* GULF, COLORADO & SANTA FE RAILWAY COMPANY.

No. 1533. Decided April 5, 1906.

**Negligence—Contributory Negligence—Presumptions—Peremptory Instruction.**

A nightwatchman, employed by a railroad company to patrol a deep cut in the track and warn passing trains against obstructions, was found, in the morning, by the track, apparently struck by a passing train. The rules required trains to be under control at this point, and to give warning signals on approaching it, and those operating the train striking deceased testified that they did not see him in going through the cut. There was testimony that deceased was sober when last seen, at 2 o'clock in the morning, but he had a small bottle of whiskey, and vomited with an odor of whiskey after he was discovered. He remained unconscious till death, and there was no evidence as to his position when struck except by inference from the circumstances and position when found. Held, that the proof warranted a peremptory instruction to find for defendant. (P. 621.)

Certificate of dissent from the Court of Civil Appeals for the Second District, in an appeal from Bosque County.

The majority and dissenting opinions in the Court of Civil Appeals were as follows:

### OPINION.

CONNER, CHIEF JUSTICE.—Lewis Hancock, a minor son of appellants, was killed by one of appellee's·trains in a deep cut near Valley Mills, Texas, on October 3, 1902. On the trial for damages therefor, the court instructed the jury that the evidence showed conclusively that his death was due to his own contributory negligence, and hence to return a verdict for the defendant. This appeal is from the verdict and judgment entered in accord with said instruction.

The evidence, briefly stated, shows that the deceased had been employed as a section hand by one of appellee's section foremen. Upon his application he had been assigned to act in the capacity of a night watchman, whose duty it was to walk through and guard the cut mentioned, and to keep the track therein clear by watching for and removing any obstruction that he could remove, and in event he found an obstruction of such character as he was unable to move in time, then to watch for and stop any passing train by giving a signal with a red lantern with which he had been provided. The deceased was between nineteen and twenty years old, fairly well matured for his age, and of at least average intelligence, and had theretofore served as section hand and night watchman with the knowledge and consent of appellants. Appellee's track approached said cut upon a curve and it was down grade in passing from the south to the north; no one witnessed the killing; but appellant, J. M. Hancock, who lived near the north end of the cut, testified that he was expecting his son to come to breakfast about six o'clock, and the deceased not having done so, he went and found his son lying on the left hand or west side of the track when going north; that he found the body of his boy lying with his head to the south about two or three feet from the track, with his feet to the north, or perhaps a little to the northwest, his feet being further from the track than his head; that the deceased's hat was found upon the track from two to three feet from where he was lying, cut in two on the rails; that one of the lanterns which the deceased carried was lying about south of the body some twelve or fourteen feet; that the other lantern had been crushed, the frame being some thirty feet north of where he was lying and the glass crushed along the track; that the lanterns were found on the same side of the track as the body; that the front side of the deceased's head was mashed in at the corner of the forehead and his left upper arm was broken, and there was a bruise about the body which the evidence fails to locate. The evidence further shows that it had been raining and that there was water about four feet wide on each side of the railroad track in the ditch; that there was some three and one-half or four feet of space between the water and the rail of the track nearest where the deceased's body was found; that the body was found near the north end of the cut, from which point an approaching northbound train could be first observed about 41 rail-lengths, where such a train would go out of sight and again come into plain view

within seven or eight or ten rail-lengths; that when conditions were favorable trains approaching the cut could ordinarily be heard for a half a mile. The evidence further shows that there were three of appellee's trains which passed through the cut in question on the morning of the injury under consideration. The first was a train going south about 4:30 a. m.; the second a passenger train going north about 5:30 a. m.; the third a freight train also going north about 5:50 a. m. One of appellee's rules required trains approaching the cut to whistle or ring the bell as a warning to persons who might be therein; another required operatives of northbound trains to have them under control while passing through said cut. The record is silent as to the rate of speed of the southbound 4:30 a. m. train, and as to whether or not the usual signals were given. The evidence shows that the northbound freight, which passed through the cut about 5:50 a. m., gave the usual signals and is not shown to have been going at a prohibited speed. The evidence relating to the northbound passenger train is that of appellant, J. M. Hancock, who testified in substance that on the morning that his son was killed, he was on his front gallery at the time the passenger train passed; that it blew for the station about the time that the train got up to the county road, the evidence showing that the county road crossed the track at a point a short distance north of where the body was found; that the train was going about the average speed of a passenger train, which the evidence tends to show was greater than the speed allowed by the rule; that "If they ever rang the bell, I didn't know it. They blew the whistle just before they got opposite my house. When it blew the whistle I heard, it had done passed the place where he was and was coming on north." We make the following further quotation from the testimony of J. M. Hancock on cross-examination: "When I first noticed this first train (the northbound 5:30 passenger) that morning after I first got up, it was right along about where the boy was killed, just coming out of the cut. I don't know whether I had heard it before or not. I might have heard it running. It might have been that which caused me to get up when I did. I may have heard the train running a good ways back. I had got up and got out on the gallery when I heard it whistle down at the crossing. I noticed it whistling and heard the other train, as I supposed, about three miles off. . . . I might have been waked up by hearing the first train; that might have been what caused me to get up, because I wanted to get up early that morning to get an early start to Waco. I don't have any definite recollection of having noticed that first train before then. There had been no whistle from it, I am satisfied, because I think I would have heard it before. Trains may sometimes pass there and me not hear them, but that was about my time to get up and it might have caused me to notice this train. I heard it running and supposed it was the passenger train coming. I might not have noticed it more than a half-a-mile back; I don't know; it was the first train that I saw, and then I heard the other train whistle. I heard the other train whistle again about the south end of the big cut. . . . I think there is a whistling-post up there about the south end of the big cut." The engineer and fireman of the 5:30 passenger train both testified that it was the rule and

their custom to sound signals of warning in approaching the cut, but ·that they had no distinct recollection of having done so on the night that the deceased was killed; that neither saw Lewis Hancock or any other object upon the track in the cut that night; that their duties were such as to frequently call their attention away from the track in front, and that such might have been the case for the short period of time they would have been able to see Lewis Hancock, had they been looking for him. It was further shown that a younger brother of the deceased had been with him in the cut the night before until about 2 o'clock a. m., at which time, he testified, his deceased brother was perfectly sober, though there was about two inches of whisky in a pint bottle that the deceased then had in his bucket,·and which evidence further tends to show the deceased had drunk between 2 a. m. and the time when his body was found, as stated.

Appellee's principal contentions in support of the action of the court in giving a peremptory instruction, are to the effect that the undisputed testimony shows that it was the duty of the deceased to keep awake and sober, and to maintain a vigilant lookout, with full knowledge that rapidly moving trains were likely to pass him at any minute; that he went on or close to the railroad track and remained there until struck by a train, when he could have seen or heard the same in time to have avoided the accident, and that hence, in the absence of any evidence of the exercise of care on his part, he was prima facie guilty of contributory negligence regardless of whether he was asleep or awake, drunk or sober; that the injuries found upon the body of deceased can only be accounted for upon the hypothesis that he must have been sitting on the cross ties and struck by the side projections of the engine; that the whisky he drank caused him to go to sleep close to the track, and hence that the deceased was guilty of contributory negligence in this respect; that the evidence fails to show that the usual and customary warning signals were not given; that the rule requiring northbound trains to be under control at the point of injury, had no application to the deceased, and that if it be assumed that said northbound passenger train was not under control and that warning·signals had not been given and that there was negligence in these respects, that there is not evidence sufficient to support the issue that such negligence was the proximate cause of the death of the deceased.

The majority have concluded that the court committed error as assigned in giving the peremptory instruction noted. If it be assumed, which we will do for the present, that the evidence tends to show that Lewis Hancock was killed by the northbound passenger train, and that the operatives thereof were guilty of negligence in failing to give the usual warning signals, and in running at a greater speed than as prescribed by appellee's rule, then under well-established principles of law we see nothing in the evidence that compels the conclusion that the death of Lewis Hancock resulted in whole or in part from his own negligence. Just how it happened, no one can say from this record. Quoting our Supreme Court in the case of Gulf, C. & S. F. Ry. Co. v. Shieder, 88 Texas, 161: "The law raises no presumption of negligence from the mere fact of injury." The law of contributory negligence goes

even farther. In the absence of evidence to the contrary, it must be assumed that Lewis Hancock was at the time in the exercise of ordinary care for his own safety. (Lee v. International & G. N. Ry. Co., 89 Texas, 588; Texas Mid. Ry. Co. v. Crowder, 64 S. W. Rep., 90; Texas & Pac. Ry. Co. v. Gentry, 163 U. S., 353; 41 L. R. A., 186; 2 Labatt on Master and Servant, pp. 2329, 2330, and authorities cited in 20 Cent. Dig., 132, sec. 79.)

In the case first cited supra, the husband of the plaintiff was run over and killed by a switch engine because of an evident inability of the deceased to free one of his feet from a frog of a switch track in which it had become fastened. The act of the deceased in stepping in the frog was unexplained by the evidence, the Supreme Court says: "There is neither proof nor presumption of law that deceased was negligent in taking that step, and we can not see how it can be said that he was negligent in the act of stepping into the frog. Being there he must step somewhere, and, seeing the train coming, he would naturally step off the track, when it may be by misfortune he got his foot fastened in the frog. These facts to our minds strongly indicate negligence, but they are not so conclusive as to exclude a difference of opinion among ordinary men as to whether the deceased did what a man of ordinary prudence would have done at that time and under like circumstances, and they did not warrant the holding as matter of law—a necessary conclusion—that deceased was negligent in taking that step; in so holding, the Court of Civil Appeals was in error." 89 Texas, 588, 589. In Texas Mid. Ry. Co. v. Crowder, supra, the deceased stepped upon the track and walked thereon some thirty or forty feet before being struck and killed by a backing engine and cars. The evidence failed to definitely show that he looked and listened before or after stepping on the track, yet the court held that the issue of contributory negligence was for the jury. So, in the Gentry case and many other cases that might be cited, among which we refer to Hutchens v. St. Louis S. W. Ry. Co., 89 S. W. Rep., 24; Gulf, C. & S. F. Ry. Co. v. Matthews, 13 Texas Ct. Rep., 244; and Schum v. Pennsylvania Ry. Co., 107 Pa. St., 8, the injured person was not seen at the time he was run over and killed, and yet in all of them it was held that contributory negligence would not be presumed. They all recognize the presumption that the deceased acted with due care for his own safety, and devolve the burden of proof upon the party asserting it to establish by evidence the fact of contributory negligence.

The cases cited also establish the proposition that in order to authorize the court to withdraw the case from the jury by a peremptory instruction, the evidence tending to establish contributory negligence must be of such character as that there is no room for ordinary minds to differ in the conclusion to be drawn therefrom. Can it be said that it conclusively appears from the evidence in this case that Lewis Hancock's own negligence contributed to his death? We think not. It is undoubtedly true as a general rule, if indeed an exception thereto should be permitted in any case, that the master must exercise ordinary care to safeguard the life and limb of his servant. Ordinarily the servant in undertaking the employment has the right to assume that this will be

done, and the care that the law devolves upon him for his own safety does not include the duty of exercising care to observe whether the master has done or omitted to do what the law requires of him. Lewis Hancock clearly was rightfully in the cut where he was killed, and the majority find nothing in the record to compel a finding that the rules before adverted to relating to speed and whistling did not include the deceased within their beneficial purposes; on the contrary, we think, as may be illustrated by the case of the Texas Cent. Ry. Co. v. Bender, 8 Texas Ct. Rep., 24, that a jury would be fully warranted in finding that Lewis Hancock had the right to expect the usual warning signals to be given by approaching trains. His duty required him to be in the cut and his instructions required him to walk the track, or near enough thereto to constantly observe it. If it be insisted that he was negligent in being upon the track rather than in the pathway beside it, the answer is that there is no evidence that shows that he was required by any rule or instruction of appellee to walk in the path, and nothing that shows that he was not thereon when struck? It can hardly be said with any show of reason that it conclusively appears that he was drunk, or had drunk sufficiently to materially impair any of his faculties. His brother testified that the deceased was sober at 2 a. m. and had not previous thereto drunk any whisky. It was at most for the jury to say what effect two inches of whisky in an ordinary pint bottle would have, and that deceased drank that much is but an inference from the facts that the bottle was found empty near the body, and that the deceased exhaled whisky fumes in vomiting the next morning, the attending physician testifying that in his opinion the act of vomiting was the result of nervous shock rather than of drunkenness. The asserted fact that he was lying down or asleep is but an inference from the circumstances shown, and is by no means conclusively established, if, indeed, it is not rebutted by the evidence, and the suggestion that the instructions of Lewis Hancock devolved upon him the duty of looking for trains, and that, had he been performing that duty, he necessarily would have seen the train which killed him, may be met with the suggestion that the evidence shows that his primary duty was to watch for obstructions and for trains only in event that obstructions were found; that he had the right to assume that the operatives of trains would not be guilty of negligence; and that it is not to be presumed that he would deliberately stand in the way of destruction; besides, it does not appear that the deceased in fact did not see the approaching train; but if he in fact was killed by the northbound passenger, and if in fact this train was going rapidly without giving any warning signal, he may have observed it too late to get out of the way. In short we think the issue of contributory negligence was for the jury, and that the court erred in taking it away from them.

Perhaps a more serious question in the judgment of the majority is presented by the contention that the evidence failed to show that appellee's negligence was a proximate cause of the death of Lewis Hancock. The case was not disposed of on trial upon any such contention, and we have finally concluded not to do so. Upon the submission of this cause before us, it seemed to be conceded by counsel for appellee,

as, indeed, it may be said that there is evidence tending to show, that Lewis Hancock was killed by the passenger train which passed through the cut in question about 5:30 a. m. If this be conceded, then we feel unwilling to say that the evidence of the appellant, J. M. Hancock, does not at least raise the issue of negligence on the part of the operatives of said train. If they were negligent in failing to give warning and in operating the train at a prohibited speed, and the jury should find Lewis Hancock without contributory negligence, we think it for the jury to say whether the negligence, if any, of the engineer and fireman of said passenger train was a proximate cause of Lewis Hancock's death. We think the cases hereinbefore cited on other propositions support this conclusion, particularly in view of the fact adverted to, that the trial court disposed of the case upon the issue of contributory negligence alone.

It is accordingly ordered that for the error of instruction shown, the judgment be reversed and the cause remanded for a new trial.

Stephens, A. J., dissenting.

## GROUNDS OF DISSENT.

STEPHENS, ASSOCIATE JUSTICE.—Lewis Hancock was employed by the section foreman to keep the track clear in the big cut the night he was killed and was instructed to "watch it until after train No. 18 went north," which train, it is claimed, killed him. He was told not to sit down, as he might go to sleep, and was directed to take two lanterns with him, one red and one white, and not to light the red one, with which he was to stop a train in case he found anything on the track, unless he needed it. This section foreman further testified, as did various other witnesses, and there was no evidence to the contrary, that "when track-walkers are out on the line it is not expected that the train crew will look out for them, but that the track-walkers will keep out of the way of the trains and keep the track clear. The train crew is not supposed to know the track-walkers are there. If there is any danger that the track-walker can not clear away, he is supposed to flag the train." Lewis Hancock was, therefore, sent out that night to watch for trains and not trains to watch for him. If he had faithfully discharged his duty as watchman he would not have been killed. The circumstances attending his death place him in the attitude of having neglected the very duties he had undertaken to perform. He had ample space on either side of the track to keep out of the way of trains. The cut, according to the testimony even of his father, was twenty-four feet wide at the deepest place, and the narrow, shallow strip of seep water on either side of the track was some four feet from the track. So far from affording any reasonable explanation of his conduct consistent with the care he had undertaken by contract with appellee to exercise, the circumstances all tended in the opposite direction. The wounds and position of his body, the position of his hat and lanterns, and the fact that he was not seen by the train operatives, to say nothing of the bottle of whisky from which he had evidently been drinking, all tended

to show that he had sat or laid down, and possibly gone to sleep, too near the track. These circumstances, however, were not of themselves conclusive, but are important in that they fail to rebut the inference of negligence otherwise raised.

The case differs from the licensee cases cited in the opinion of the majority. A man walking a railroad track by invitation or consent of the railroad company is only required to use the care of a person of ordinary prudence for his own safety, and the railway company owes him the duty of similar care to avoid injuring him. In the case at bar the man was not only under the ordinary obligation to exercise care for his own safety, but he had undertaken for a valuable consideration to be a watchman—to exercise extraordinary care—for the safety of appellee's passengers and trainmen, whereas appellant, according to the testimony, owed no such duty to him. Suppose his body had thrown the train from the track, when he had undertaken to see that it had a clear track, would not this raise the inference of negligence against him, and without explanation would it not be conclusive? There can be but one answer to this question, and the case supposed is not distinguishable from the one before us.

Besides, the evidence did not raise any other issue as the proximate cause of the accident except the negligence of deceased; and the court could not have submitted any of the alleged grounds of recovery without inviting the jury to enter the domain of conjecture.

The writer therefore concurs with the trial court in holding that on the conceded facts appellants had no case.

*Lockett & Cureton* and *Pendleton, Ferguson & Durrett,* for appellants.—When there is any evidence tending to support an issue, it is error for the court to direct the jury as to their verdict; and in this case there was a conflict in the evidence from which the jury might reasonably have found that the deceased, Lewis Hancock, was killed by reason of the negligence of the defendant and not by reason of his own contributory negligence, and the court erred in taking the said issue from the jury and instructing a verdict for defendant. The evidence touching the manner in which the deceased was killed being wholly circumstantial and the proximate cause of the death of deceased being entirely a matter to be inferred and decided from circumstances and facts proven on the trial, it was peculiarly a case for the decision of the jury, and the court erred in refusing to submit to the jury the question of the proximate cause of the death of deceased, instead of instructing them as a matter of law that the contributory negligence of deceased was the proximate cause of his death. 4 Am. & Eng. Enc. Law, 91, note 5; Gulf, C. & S. F. Ry. Co. v. Shieder, 88 Texas, 152; City of Hillsboro, v. Jackson, 18 Texas Civ. App., 326; Lee v. International & G. N. Ry. Co., 89 Texas, 583; Galveston, H. & S. A. Ry. Co. v. Harris, 22 Texas Civ. App., 20.

WILLIAMS, ASSOCIATE JUSTICE.—At the trial of this cause in the District Court, a verdict in favor of defendant was rendered upon a peremptory instruction given by the court. On the appeal of the plaintiffs, a majority of the Court of Civil Appeals held that the evidence was sufficient to raise issues of fact which plaintiffs were entitled to have submitted to a jury, Mr. Justice Stephens dissenting. The question, "whether, under the facts, the court committed reversible error in giving the peremptory instruction to find for appellee," was then certified to this court and is now before us for decision. We answer that the instruction was not error. The subject is sufficiently discussed in the opinions of Mr. Chief Justice Conner and Mr. Justice Stephens, which will be reported along with this, and we consider further comment unnecessary.