WILLIAM MILLER & SONS CO. v. WAYMAN et al.

(Court of Civil Appeals of Texas. Galveston. April 18, 1913. On Motion for Rehearing, May 9, 1913.)

1. MASTER AND SERVANT (§ 274*)—ACTION FOR INJURIES—EVIDENCE.

In an action for the death of an employé whose business it was to keep in repair an elevator shaft in an unfinished building and who was struck by a descending bucket used in hoisting building materials and allowed to fall of its own weight without any warning and without ascertaining whether deceased was in a position where he was likely to be struck, evidence that deceased had worked for defendant on other buildings at the same kind of work and where the apparatus and conditions were the same as on the building in question should have been admitted to show deceased's intimate knowledge of the conditions and dangers of the work in which he was engaged at the time he was killed.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 939–949; Dec. Dig. § 274.*]

2. APPEAL AND ERROR (§ 1057*)—HARMLESS ERROR—INSTRUCTIONS.

The exclusion of such evidence was harmless, where the undisputed evidence showed an intimate knowledge by deceased of the conditions of the work, the operation of the bucket in the shaft, the danger from the falling bucket to any one in the shaft when it was above him, the impossibility of any one above the bucket seeing him in the shaft or of conveying any warning to him, and of the fact that no signals had been provided for or were used.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4194–4199, 4205; Dec. Dig. § 1057.*]

3. MASTER AND SERVANT (§ 217*)—LIABILITY FOR INJURIES—ASSUMPTION OF RISK.

Where an employé working on an elevator shaft in an unfinished building voluntarily placed himself in a position of danger while a hoisting bucket which was permitted to fall of its own weight was above him, although his work could have been accomplished by waiting until the bucket was lowered, with not only general knowledge that the bucket was operated in this way without giving warning before permitting it to drop, but also with knowledge that it would be so operated at the particular time and that no warning would be given, after being warned not to go in the shaft while the bucket was above him before, and at the time of, the accident, in reliance on his own ability to avoid the falling bucket, and not in reliance on any expectation that he would be warned, he assumed the risk of injury from the employer's negligence in permitting the bucket to drop without warning him or without ascertaining whether he was in a position to be injured, since it does not affect the defense of assumed risk that the danger was brought about by the negligence of

the employer, if the injured employé knew at the time of the dangerous condition brought about by the negligent conduct of the business and of the extra danger to himself therefrom.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 574–600; Dec. Dig. § 217.*]

4. MASTER AND SERVANT (§ 179*)—LIABILITY FOR INJURIES — NEGLIGENCE OF FELLOW SERVANT.

Under Rev. St. 1895, art. 3017, subd. 1, giving a cause of action for wrongful death caused by the negligence of the proprietor, owner, charterer, or hirer of any railroad, stagecoach, or other vehicle for the conveyance of goods or passengers or by the unfitness or negligence of their servants or agents, and subdivision 2, giving such cause of action when death is caused by any wrongful act, negligence, unskillfulness, or default of another, a private corporation which is not one of those referred to in subdivision 1 is not liable for the death of an employé through the negligence of another employé, but is liable if the death was caused by the negligence of a vice principal.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 354–358; Dec. Dig. § 179.*]

5. MASTER AND SERVANT (§ 190*)—LIABILITY FOR INJURIES — NEGLIGENCE OF FELLOW SERVANT.

Where a vice principal negligently directed an employé to signal an engineer to permit a hoisting bucket in an elevator shaft to drop without warning another employé working in the shaft or ascertaining whether he was in a position to be injured and he was struck by the bucket and killed, his death was due to the negligence of the vice principal, and not to the negligence of the coemployé; the death not having been caused by any negligent execution of the order by the coemployé but by its execution at all.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 449–474; Dec. Dig. § 190.*]

6. APPEAL AND ERROR (§ 1175*)—DISPOSITION —RENDERING FINAL JUDGMENT.

In an action for the death of an employé where the evidence was fully developed and no evidence offered by plaintiff excluded, and the undisputed evidence showed that plaintiff assumed the risk and did not suggest that upon another trial any additional facts could be disclosed, the court in reversing a judgment for plaintiff would render judgment for defendant as permitted by Rev. St. 1895, art. 1027, providing that when the judgment below shall be reversed the court shall render such judgment as the court below should have rendered, except when it is necessary that some matter of fact be ascertained or the damage to be assessed or the matter to be decreed is uncertain, in which cases the case shall be remanded for a new trial.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4573–4587; Dec. Dig. § 1175.*]

On Motion for Rehearing.

7. MASTER AND SERVANT (§ 278*)—ACTIONS FOR INJURIES—SUFFICIENCY OF EVIDENCE.

In an action for the death of an employé working in an elevator shaft in an unfinished building and struck by a descending bucket used to hoist materials and permitted to fall by its own weight, evidence *held* insufficient to show that the vice principal in charge of the work promised to protect him while he was working in the shaft.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 954, 956–958, 960–969, 971, 972, 977; Dec. Dig. § 278.*]

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key-No. Series & Rep'r Indexes

Appeal from District Court, Harris County; Wm. Masterson, Judge.

Action by Nell E. Wayman and others against William Miller & Sons Company. Judgment for plaintiffs, and defendant appeals. Reversed and rendered.

Hunt, Myer & Teagle, of Houston, for appellant. W. H. Ward and J. E. Melton, both of Houston, for appellees.

REESE, J. E. E. Wayman, on or about July 10, 1911, was in the employment of William Miller & Sons Company, a corporation, which was constructing a nine or ten story building in the city of Houston known as the "Southern Pacific Building." While so engaged at work upon said building, Wayman was, on the date mentioned, killed by being struck by a large bucket used for hoisting concrete and other building material through a shaft or open space in the building called an "elevator shaft," and which bucket was descending through the shaft from the roof to the bottom of the shaft. This suit was instituted by Mrs. Nell Wayman, widow, and the father and mother of the deceased Wayman, against the said William Miller & Sons Company to recover damages for his death. A trial with a jury resulted in a verdict and judgment for plaintiffs for $14,000, apportioned $10,000 to the widow, and $2,000 each to the father and mother of deceased. Defendant made a motion for a new trial, which was overruled, and brings the case to this court on appeal.

After describing the place at which deceased was at work and the manner in which he received the injuries which resulted in his death on the following day, it is charged in the petition that the injuries and death were the proximate consequence of the negligence of defendant and of its vice principal, Lane, in the following particulars: First, in failing to exercise ordinary care to warn Wayman of the descent of the bucket in time to allow him to get out of the way; second, in causing the bucket to be lowered without exercising ordinary care to ascertain whether Wayman had gotten out of the elevator shaft, where he was at work; third, in failing to have in operation distinct, audible signals, which would have served to warn Wayman that the bucket was to be lowered; and, finally, that defendant and its said vice principal were guilty of negligence, which was the proximate cause of the death of Wayman, in causing the bucket to be sent down with full knowledge that Wayman was engaged in working in said elevator shaft, and without ascertaining that he had left the shaft. Defendant pleaded the general issue and in addition, with appropriate averments, the issues of contributory negligence and assumed risk. The court did not submit the third ground of negligence, as charged in the petition, of failure to have in operation a system of sig-

nals for warning employés of the ascent and descent of the bucket.

We have read very carefully the statement of facts, which is short, and do not find that there is any conflict in the evidence upon any material 'fact. The following conclusions arise upon the undisputed evidence:

At the time of the accident referred to, E. E. Wayman was in the employment of appellant, a corporation which was engaged in erecting a large building in the city of Houston, and Wayman had been so employed on this building for about five months prior to the accident in the same kind of service in which he was engaged at the time he was killed. Wayman was a skilled mechanic, about 26 years old. In doing the work of the erection of the building, which was about nine stories in height, appellant had had constructed inside of the building an elevator shaft, being a square opening extending entirely through the building, from the ground floor to the roof, about four or five feet square. A large iron bucket, about four feet square, weighing about 500 pounds, and which occupied practically all of the space of this elevator shaft, was carried up and down through the shaft from the ground to the roof by means of a rope, which ran through pulleys at top and bottom of the shaft. This rope was wound around a drum at the bottom of the building and by the side thereof, and a small engine, with steam power, so operated this drum as to raise and lower the bucket. The bucket was used for the purpose of carrying concrete and other building material to the different floors of the building. On the fourth floor of the building there was a receptacle called a "hopper," which was about flush with the edge of the shaft and a few feet above the floor. In carrying concrete in this bucket to the fourth floor there was an opening in the shaft, and it was so contrived that by the use of a trigger, when a bucket full of concrete got to this floor, it would automatically tilt up and deposit the contents of the bucket in this hopper. When being used this bucket was carried up rather slowly, but when it was desired to lower it this was done by releasing a clutch at the engine, when the bucket fell of its own weight, and very swiftly, practically like any heavy body, falling of its own weight without impediment. When this bucket was up and it was desired to lower it, some person would go to the side of the building next to the engine on the floor on which the bucket was, drop something on the roof over the engine to attract the attention of the person operating the engine, and then indicate by a motion of the hand that the bucket was to be lowered. The bucket so filled the space of the shaft that a person above where the bucket happened to be could not see anything in the shaft below the bucket. When a person was working in or partly in the elevator shaft, as Wayman was, with the bucket above him there was no way in which to give him a signal or warn him when the bucket was to be lowered. Ordinarily when at work this bucket went up and down about every 1½ or 2 minutes. This elevator shaft had been put in by Wayman, and it was his business to look after it and keep it in repair, and such had been his duty from the time it was constructed about four or five months before the accident. Whenever it became necessary to move or put in a guide (as hereinafter explained), it was Wayman's business to do the work. It was testified, however,. by the foreman, that sometimes, when Wayman was engaged at something else, some one else would be called upon to do this work. Wayman knew all about this elevator shaft and the operation of the bucket in every detail. One Charles Lane was the foreman in charge of the work. He had power and authority to direct the work being done by Wayman and his coemployés, with power to hire and discharge the men, including Wayman, and was therefore a vice principal, and not the fellow servant, of Wayman.

On the morning of the accident Wayman was working on the fourth floor of the building. They had been carrying concrete to this floor, in consequence of which there was an opening in the elevator shaft to enable them to unload the bucket in the hopper on this floor. In order to enable them to carry the bucket up and beyond this floor, it was necessary to close this opening so as to prevent the tilting of the bucket when it got to this floor. This was done by placing what was called a "guide" across this opening. This guide was a piece of timber, two by four, and about four feet long, which was nailed upright across the opening. In order to do this work of putting in the guide, it was necessary for the person doing the work to have some part of his person within the elevator shaft, so as to nail the guide, but not to get entirely within the shaft. Lane told Wayman to fix this guide, as he wanted concrete on the roof. Lane then went down to the ground floor, got in the bucket with some steel rods, and was. carried to the roof. The guide not being in on the fourth floor, Lane kept the bucket from tilting when he came to the opening on this floor by the weight of his body on the opposite side of the bucket. Wayman waited a few minutes after the bucket passed up and began, with the assistance of a fellow servant, one J. W. Walker, called "Red," to put in the guide. To do this he stood upon the hopper and. reached inside of the elevator shaft to nail the guide fast. In doing this parts of Wayman's body were exposed inside of the shaft. It was shown without dispute, by the testimony of Walker, appellees' witness, that while in this position with the bucket above him, Walker warned him that it was dangerous to go inside of the

shaft, or to work in the manner in which he was working. This witness testified: "I warned Wayman about the bucket falling and the danger of being struck by it, by hollering to him twice, 'Look out,' when the bucket was coming down. When the bucket was coming up and before it started down, I told him not to go in then, that it was dangerous, and he said, 'Red, I will get out of the way.' I warned him just a few seconds before he was struck that the bucket might come down and strike him and not to work in the manner in which he was working at that time. In reply to my warning he said: 'Red, I will get out of the way; don't be afraid; don't be scared about me. I will get out of the way of the bucket.' When he said he would get out of the way of the bucket, I said to him: 'I would not get in there. It is dangerous. The bucket has gone up over us. We cannot get any signals in here.'" This witness testified by deposition taken by appellees, and part of the testimony detailed was in response to direct interrogatories. The bucket after reaching the roof remained long enough to unload and place the steel rods, about 15 minutes, when one Green was directed by Lane to have the bucket lowered. Green then went to the edge of the roof next to where the engine was, dropped a stone on the roof over the engine, and, having thus gotten the attention of the engineer, gave the signal to lower the bucket. The clutch was released, and the bucket dropped through the elevator shaft. Wayman was at the instant standing on the hopper with part of his body inside of the shaft. The bucket struck him, but did not knock him into the shaft, but as the bucket passed him, or the instant after it passed him, he toppled over and fell head foremost into the bucket. He was unconscious when his fellow workmen reached him, and died the next day. His death was caused by the descent of the bucket through the elevator shaft striking him as aforesaid. Appellee Mrs. Nell Wayman is the wife, and the other plaintiffs are the parents, of the deceased, Wayman. He left no children.

[1] Appellant offered evidence to show that Wayman had been in the employ of appellant for more than two years; that he had worked for appellant on other buildings in Houston at the same kind of work and where the tools, apparatus, and conditions were the same as on the Southern Pacific building, which evidence was (we think erroneously) excluded. The purpose and effect of the evidence was to show an intimate knowledge by Wayman of all of the conditions and dangers of the work in which he was engaged at the time he was killed.

[2] We think the error was, however, harmless, as we find that the undisputed evidence shows an intimate knowledge by Wayman of all of the conditions of the work, the operation of raising and lowering of the bucket in the elevator shaft, the danger from the fall-

ing bucket, to any one in the elevator shaft when the bucket was above him, the impossibility of any one above the bucket seeing him in the position in, or partly in, the shaft, or of conveying any warning to him that the bucket was about to be lowered, and of the fact that no signals had been provided for, or used, in such cases. We find from the undisputed evidence that Wayman had been warned by Lane, the foreman, about the danger of working on the elevator shaft when the bucket was above him. The undisputed evidence is of such a character that no other conclusion can be arrived at than that Wayman was as fully apprised as one could be of the danger of exposing any part of his person in the elevator shaft while the bucket was above him, that the bucket was liable to drop any minute, and without signal or warning to him. It is also the result of the undisputed evidence that Wayman could just as well have waited until the bucket was lowered before putting in the guide, as this work only took about ten minutes to accomplish. Evans, plaintiffs' witness, testified, and all of the testimony on the point was to the same effect: "Signals for hoisting and lowering the bucket were given by a man stepping to the outside of the window over next to the engine and dropping a rock or something on the roof over the engine and signaling to the engineer. The method of warning used inside the building to those who were working on or about the elevator shaft was, when we were doing work in the elevator shaft, we generally signaled to a man up above or a man below when we got in or would be putting in the guide or taking it out. There was no way that I know of to signal those who might be engaged in working in the elevator shaft, or to warn them of the descent of the elevator bucket. If there had been one, I would have known it." Walker, witness for plaintiff, testified that the proper way to have repairs made on the inside of the shaft was to have stopped the machine that runs the bucket, get entirely into the shaft, and do the repairs, and then get out; but the undisputed evidence shows that Wayman knew that this method was not pursued.

[3] By appropriate assignments of error appellant assails the verdict of the jury as being contrary to the evidence and without any evidence to support it, both on the ground that it is shown that the accident to the deceased Wayman arose out of and was the result of a risk known by him and voluntarily assumed, and that such injuries were the proximate result of his own negligence. The reply is made to this contention, so far as the defense of assumed risk is concerned, that the risk and danger were brought about by the **negligent act of Lane,** appellant's vice principal, in sending down the bucket without first having either signaled Wayman to get out of the way, or ascertained that he was not in a position to be struck by the

descending bucket. Conceding that Lane was thus negligent, or that this fact has at least been found by the jury upon sufficient evidence, and the accident was proximately caused by such negligence which would be the negligence of appellant itself, if there was no other feature of the evidence to affect or control the legal result, the case would come under the well-settled doctrine that a servant cannot be held to have assumed the risks of dangers to which he is subjected by the failure of the master to exercise ordinary care, not only to provide a reasonably safe place for him to work, but to conduct his business in a reasonably safe manner for the protection of the servant. But it is the result of the undisputed evidence that Wayman knew that the bucket was above him, that it was to be expected that it would be sent down at any moment, that no signals or warning would be given him of the descent of the bucket, and that he could not expect that Lane would or could' practically ascertain before sending the bucket down that he was not in a position to be struck by it. Not only did Wayman have this general knowledge of every danger arising from his doing the work as he did acquired by his intimate knowledge of the means employed and the manner in which the work had been customarily done, and was then being done, but he had been warned by Lane and others of the danger of doing the very thing which he was engaged in doing, and which was the proximate cause of his death, and he was also warned and his attention called to the danger at the very time of the accident. It is conclusively shown by the testimony of Walker, appellees' witness, that Wayman did not rely for his safety while in the shaft upon any warning to be given to him of the descent of the bucket, nor upon Lane's ascertaining that he was not in the shaft before sending the bucket down. He relied upon his own ability to escape the danger by dodging out of the shaft in time to escape injury if the bucket came down while he was at work in the shaft. There is nothing in the record to support the contention put forward by appellees in their brief that Lane had promised to protect him while working in the shaft, or that he relied upon this. Lane merely directed him to fix the guide. Wayman knew what to do and how to do it, and the circumstances under which the work was to be done. He was not required by his orders to put in this guide or to go inside of the shaft in order to do so, while the bucket was above him. He could have waited until the bucket was lowered. He voluntarily assumed the extra risk of going inside of the shaft while the bucket was above him, with full knowledge that it might drop at any moment without warning.

In the case of G., C. & S. F. Ry. Co. v. Huyett, 99 Tex. 636, 92 S. W. 456, 5 L. R. A.

(N. S.) 669, Judge Williams, speaking for the court, uses this language: "But the jury could, perhaps, have thought that, while this was a dangerous and negligent manner of doing the work, yet it was the one in which it was commonly and habitually done by the defendant, and that plaintiff knew that fact. Under such circumstances there would, we think, be an assumption of risk arising from a danger known to have sprung from the master's negligence. Of course the mere fact that such an occurrence may have occasionally happened before would not have this effect for the reason that an employé may not be held to foreknow that negligent conduct would be repeated. The assumption of risk would arise from the doing of the work in a manner so common and habitual that the employés should know that it would be followed on the particular occasion."

In this case we have, from the undisputed evidence, not only knowledge on the part of Wayman of the habit or custom, but actual and unmistakable knowledge that the work of lowering the bucket would be done in the same way on this occasion, and a clear appreciation of the danger to himself, arising therefrom. We understand the effect of this statement of the law in the Huyett Case to be that it does not affect the defense of assumed risk that the danger was brought about by the negligence of the master, if in fact the injured servant knew, at the time, of the dangerous condition thus brought about by the negligent conduct of the business, and of the extra danger to himself in the situation in which he placed himself. If the defense of assumed risk is not to be sustained, except in cases where the master is not negligent with reference to such risk, there would be practically no use in such plea. The master not being negligent, there would be no liability independent of any defense of assumed risk. In the case of St. L. Ry. Co. v. Brisco, 100 Tex. 354, 99 S. W. 1020, the Supreme Court undertakes to distinguish, not very satisfactorily, the Huyett Case, supra, from the case of H. & T. C. Ry. Co. v. Turner, 99 Tex. 547, 91 S. W. 562. One ground of distinction, so far as we understand the opinion, is that in the Huyett Case the plaintiff was himself engaged in the work by the negligent conduct of which he was injured, while in the Turner Case he was engaged in an independent employment having no connection with the negligent switching of the cars by which Turner was injured. It might be urged, by way of applying the doctrine of the Turner Case to the present case, that Wayman was engaged in a work having no connection with the raising and lowering of the bucket. The only sound basis for such distinction is that one engaged in an independent work would not know that the operation by which he was injured was in fact being then negligently done, but at most would only know that it was the habit

or custom to do it negligently. The facts of the present case forbid any such distinction, in view of Wayman's actual present knowledge that the bucket would be sent down without warning to him or ascertainment whether he was in the shaft. The following cases also, we think, establish the doctrine by which this case must be ruled: Quill v. H. & T. C. Ry. Co., 93 Tex. 616, 55 S. W. 1126, 57 S. W. 948; M., K. & T. Ry. Co. v. Hannig, 91 Tex. 351, 43 S. W. 508; T. & N. O. R. R. Co. v. Bingle, 91 Tex. 288, 42 S. W. 971; Bonnet v. G., H. & S. A. Ry. Co., 89 Tex. 72, 33 S. W. 334; S. P. Ry. Co. v. Aylward, 79 Tex. 678, 15 S. W. 697. We find this statement of the author's views on this question in Judge Street's excellent and very useful work on the law of personal injuries in Texas (page 293): "Where unusual risk, resulting either from the manner of the conduct of the business, or from defective machinery used, is known to the employé, the question of his assumption of the risk arising therefrom, if capable of being assumed at all, should be determined, as in other cases of extraordinary risk; that is to say, besides his knowledge of the unnecessarily hazardous manner in which the business is conducted or of the defective condition of the machinery used, there must be shown appreciation of the danger and its voluntary acceptance in the particular instance."

We cannot entirely accept the broad statement of the author (on page 299) "that in *no* case can the fact that one habitually carried on a dangerous business in an unnecessarily hazardous manner, or with defective machinery, exposing the servant to unnecessary danger, *though known to the plaintiff*, be entertained as a defense. Such a defense is contra bonos mores." It is true that the habitual commission of a negligent act cannot rob it of its character of negligence, but the defense of assumed risk, arising from the full knowledge that the business is negligently carried on and the voluntary acceptance of the extra risk, known and appreciated, rests upon a different ground and does not depend upon a negation of the negligence. As broadly stated in the text, we think the doctrine is opposed to the authorities, at least in this state, by which we are bound.

[4, 5] Under the provisions of article 3017, R. S. 1895, appellant, being a private corporation and not one of those referred to in subdivision 1 of the act, would not be liable for the death of Wayman if the same had been caused by the negligence of one of its agents or servants, as distinguished from the negligence of the corporation itself. Fleming v. Loan Agency, 87 Tex. 238, 27 S. W. 126, 26 L. R. A. 250. But the negligence here charged was that of Lane, who was shown to have been the vice principal of appellant, and hence the negligence of the appellant for which it would be liable under subdivision 2 of the said statute. The immediate cause of the death of Wayman was the dropping of the bucket. This was done on Lane's direct order. It was not the negligent execution of the order by Green, a servant of appellant, but its execution at all, which was Lane's act as fully as though he had himself given the signal to the engineer which caused the bucket to be dropped. Hugo-Schmeltzer v. Paiz, 141 S. W. 518; Sullivan-Sanford Lumber Co. v. Cooper, 142 S. W. 1168.

[6] There are other assignments of error presented by the brief of appellant, based upon errors of procedure which, in the view we take of the main issue, need not be disposed of. Having arrived at the conclusion that the undisputed evidence supports appellant's defense of assumed risk, it follows that the judgment will have to be reversed. The facts are few and simple. The testimony offered by appellees supports the defense named, and upon the entire evidence the court should have instructed a verdict for defendant upon this issue. The evidence was fully developed. None of that offered by appellees was excluded. There is nothing to suggest that upon another trial any facts could be disclosed that would tend to rebut, explain, or modify those shown to have surrounded this unfortunate accident. In such case it is the duty of this court to render such judgment as should have been rendered by the trial court. This is the better practice and sanctioned by the statute (article 1027, R. S.), rather than prolong a useless litigation. I. & G. N. Ry. Co. v. Hall, 46 Tex. Civ. App. 493, 102 S. W. 742; Pullman Co. v. Caviness, 53 Tex. Civ. App. 540, 116 S. W. 410; M., K. & T. Ry. Co. v. Rogers, 118 S. W. 738; I. & G. N. Ry. Co. v. Reiden, 48 Tex. Civ. App. 401, 107 S. W. 661; T. & P. Ry. Co. v. Lewis, 133 S. W. 1086.

The judgment of the trial court is reversed, and judgment here rendered for appellant.

Reversed and rendered.

On Motion for Rehearing.

[7] On motion for rehearing it is insisted by appellee that the statement in the opinion that "there is nothing in the record to support the contention put forward by appellees in their brief that Lane had promised to protect Wayman while working in the shaft or that he relied upon this" is in direct controvention of the evidence.

The principal evidence relied upon to support this contention is the testimony of the witness Walker, who was working with Wayman, that Lane told Wayman: "Wayman, go put that guide in. I am going to bring up some iron, and I will ride on the bucket by the time you get it fixed." The witness so testified. This testimony, when taken in connection with the fact that Lane then went down, loaded the bucket with steel rods for the roof, and rode on the bucket past the fourth floor to the roof, and that in *going up* it was necessary for Lane to put his weight on the opposite side of the bucket to prevent

its tilting when it came to the opening on the fourth floor where Wayman was putting in the guide, could only mean that Lane would do just this. We find, as appellee requests, that Walker gave this testimony; but we do not think it can be tortured into a promise by Lane to protect or look out for Wayman while putting in the guide. Wayman clearly did not so regard it or rely upon it as an assurance that the bucket would not be sent down without Lane in it, or be kept above while he was at work in the shaft. Neither did Walker so understand it. When warned by Walker of the danger of the descending bucket, Wayman did not say, "Lane will not send it down while I am in here," or, "Lane promised me to protect me while doing the work," but: "Red, I will get out of the way. Don't be scared about me. I will get out of the way of the bucket." The evidence does not show that it was necessary to put in the guide at the fourth floor to prevent the descending bucket from tilting there, as the descent was very rapid, almost like a falling stone.

We have set out this evidence in compliance with appellees' request, and in order that they may have the full benefit of it on appeal; but we do not consider it proper to burden the record with all of the evidence mentioned in his motion.

The motion for rehearing is overruled.