GULF, C. & S. F. RY. CO. v. SULLIVAN et al. (No. 8456.)

(Court of Civil Appeals of Texas. Ft. Worth. Nov. 4, 1916.)

1. ABATEMENT AND REVIVAL ☜54—ACTIONS FOR PERSONAL INJURIES—INJURIES RESULTING IN DEATH.

Though under the common law, actions for personal injuries abated on the death of the injured person, yet by specific provision of Rev. St. 1911, art. 5686, the action of an injured person whose injuries do not result in death survives for the benefit of his heirs or legal representatives.

[Ed. Note.—For other cases, see Abatement and Revival, Cent. Dig. §§ 255–258, 261–270; Dec. Dig. ☜54.]

2. ABATEMENT AND REVIVAL ☜75(1)—CAUSE OF DEATH—ACTIONS ON INJURIES—QUESTIONS FOR JURY.

In an action by a pedestrian who died before trial, for injuries when struck by railway cars, evidence held to raise a jury question whether his injuries resulted in death or whether his death was from other causes, so as to permit revival under Rev. St. 1911, art. 5686, providing for revival of actions in the personal representatives of persons whose deaths do not result from injuries received.

[Ed. Note.—For other cases, see Abatement and Revival, Cent. Dig. §§ 441, 445–465, 467–473; Dec. Dig. ☜75(1).]

3. APPEAL AND ERROR ☜1048(2)—PREJUDICIAL ERROR—OPINION EVIDENCE.

It was prejudicial to permit plaintiff's brother, who was not a physician, to testify that after the accident plaintiff recovered and was in perfect health, such testimony being competent only from an expert witness.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 4140; Dec. Dig. ☜1048(2).]

4. ABATEMENT AND REVIVAL ☜75(1)—INJURIES RESULTING IN DEATH—QUESTION FOR JURY.

On death of plaintiff suing for personal injuries, and petition of his parents to continue

the action, it was defendant's right to have the jury instructed that, on the issue whether death resulted from the injuries, proximate cause, is not necessarily that nearest in time to the result, and that although deceased after partial recovery fell and further injured himself, if the efficient cause of his death was the injury by the cars, there could be no recovery.

[Ed. Note.—For other cases, see Abatement and Revival, Cent. Dig. §§ 441, 445–465, 467–473; Dec. Dig. ☜75(1).]

5. RAILROADS ☜350(7)—CROSSING ACCIDENTS—QUESTION FOR JURY.

Evidence held to present a jury question whether one injured by railway cars received due warning of their approach.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 1161; Dec. Dig. ☜350(7).]

6. RAILROADS ☜350(13)—INJURIES TO PERSON—CONTRIBUTORY NEGLIGENCE—QUESTION FOR JURY.

Evidence held to present a question for the jury whether a pedestrian injured by railway cars was negligent.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 1166; Dec. Dig. ☜350(13).]

7. NEGLIGENCE ☜141(3) — CONTRIBUTORY NEGLIGENCE—INSTRUCTIONS.

Defendant has the right, on request, to have an affirmative presentation of facts well pleaded, and relied on by him in support of plea of contributory negligence, if the evidence fairly supports an inference of negligence.

[Ed. Note.—For other cases, see Negligence, Cent. Dig. § 384; Dec. Dig. ☜141(3).]

8. TRIAL ☜191(8)—INSTRUCTIONS—ASSUMPTION AS TO FACTS.

In a pedestrian's action for injuries when struck by railway cars, instruction, assuming that as a matter of law, if he attempted to cross the tracks without looking or listening and after warning, he was negligent, was properly refused, when he testified that he did look.

[Ed. Note.—For other cases, see Trial, Cent. Dig. § 430; Dec. Dig. ☜191(8).]

9. RAILROADS ☜351(9)—CROSSING ACCIDENTS—INSTRUCTIONS.

In a pedestrian's action for injuries when struck by railway cars, a charge that if the railway had no watchman on the cars and gave no signal by bell or whistle it was liable, even though it had exercised ordinary care in other respects, and even though the plaintiff adequately warned of the danger in crossing the track, was erroneous.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 1201½; Dec. Dig. ☜351(9).]

10. WITNESSES ☜394—IMPEACHMENT—CORROBORATION—EVIDENCE—ADMISSIBILITY.

Where on the third trial of a case one party impeached the witness by showing that on a former trial he had testified to facts in conflict with his testimony on the third trial, it was error to permit, in corroboration, a showing that on another former trial he testified as he did on the third trial.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 1258, 1259; Dec. Dig. ☜394.]

Appeal from District Court, Denton County; C. F. Spencer, Judge.

Action by Lloyd Sullivan, by his next friend, against the Gulf, Colorado & Santa Fé Railway Company. On plaintiff's death, on the petition of G. W. Sullivan and wife, his parents, they were permitted to continue the suit. Judgment for plaintiffs, and defendant appeals. Reversed and remanded.

---

☜For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

Lee, Lomax & Smith, of Ft. Worth, and R. H. Hopkins, of Denton, for appellant. Owsley & Owsley, of Denton, and J. W. Koons, of Sanger, for appellees.

CONNER, C. J. This case has been before us on two former appeals. See G., C. & S. F. Ry. Co. v. Sullivan, 168 S. W. 473, and G., C. & S. F. Ry. Co. v. Sullivan, 178 S. W. 615. The suit was originally brought by Lloyd Sullivan, through a next friend, to recover of appellant damages for personal injuries sustained by him at Sanger, Tex., on May 19, 1913, as a result of being run over by a car attached to one of defendant's engines engaged in switching at that place. After the reversal of the judgment in the second appeal, to wit, on December 23, 1914, Lloyd Sullivan died, and the present appellees, G. W. and Lillie Sullivan, parents of the deceased, filed an amended petition, setting up the circumstances of the injury, alleging negligence, and further specifically charging that the injuries so received by their son did not result in his death, and that the cause of action in Lloyd Sullivan's favor, therefore, survived to them. Upon the trial on this amended petition, on September 9, 1915, a verdict was returned and a judgment entered in favor of appellees for the sum of $6,500, from which judgment this appeal has been prosecuted.

The deceased, Lloyd Sullivan, was injured, as alleged, while going along a pathway over which numerous citizens of the town of Sanger passed to and fro across a switch track of appellant's, by a backing train on May 19, 1913. On the first trial the cause was submitted upon the sole issue then presented of injury to the deceased after his perilous position had been discovered by the operatives of the train. On the appeal from the judgment which followed the cause was reversed and remanded, on the ground that the evidence failed to sustain the verdict and judgment on the issue of discovered peril, as will be more fully shown by a reference to our opinion on that appeal. See 168 S. W. 473. On the second trial, as well also as upon the last, the cause was submitted upon allegations of negligence on the part of the operatives of the train in failing to give warning of its approach, and of contributory negligence on the part of the deceased, which was alleged by the appellant company. On the second appeal the verdict and judgment was again reversed for a number of errors particularly specified in our opinion, and we now have, as stated, an appeal from the judgment in favor of the present appellees.

A reference to our former opinions will disclose fully the circumstances of the case. But we should, perhaps, here restate the circumstances for the sake of clearness. The injury to Lloyd Sullivan was inflicted in the town of Sanger in Denton county. Appellant's railway extends through the town in the direction of north and south. Its depot is on the west side of its main track; on the west side of the depot is what is termed a house track, which extends in a northerly direction some 250 or 300 feet where it curves to the left or west and continues to a mill and some elevators. Immediately north of the depot is a public road or street. North of the depot and between the main line and house track, approximately 150 or 175 feet, is situated a pumphouse, to which people from the northwestern part of the city frequently and constantly resorted over and across said house track for the purpose of getting water. A few feet north and a little west of the pumphouse, say some 10 or 15 feet, is situated a coal bin. This coal bin is some 6 feet from the east line of the house track. Immediately opposite the coal bin and across the house track is situated a gate leading into appellant's stock pens. The south line of the stock pens, if extended across the switch track to the coal bin, would bisect the coal bin. The passage of citizens to the pumphouse, as stated, resulted in a well-defined, frequently traveled path or roadway leading from the pumphouse in a northwesterly direction. This pathway passed the northeast corner of the coal bin, and, extending in a northwesterly direction, entered upon the house track about midway of the stock pens, this point, as we estimate, being some 50 or 60 feet north of the south line of the stock pens and some 25 or 30 feet from northeast corner of the coal bin, and some 250 or 260 feet north of the depot. This pathway, after entering upon the house track, continues in its northwesterly direction on and by the northeast corner of the stock pens. On the day in question it was shown that a person by the name of June Teacle had some mules in the stock pens for shipment, and that a freight car had been spotted in front of the stock pens for the purpose of receiving them; that Lloyd Sullivan left appellant's depot from a door in its east side, and from thence, as he testified, traveled north until he came to the road mentioned. He then found, as he stated, that a train of cars on the switch track blocked the roadway, and he therefore continued his walk until he arrived at the coal bin where he stopped and leaned up against its west wall about 6 feet south of its northwest corner. At this point Lloyd Sullivan must have been within 6 feet of the house track. As he testified, he then looked to the south along the house track, and saw the train or the engine, but the evidence leaves it somewhat uncertain which, down about the depot. After looking south, according to his testimony, he then turned in the direction of the pathway, and proceeded to and along it just north of the standing stock car until he arrived at the center of the track, at which point June Teacle, who, together with a colored helper by the name of Joe Warren, was standing upon the stockyards plat-

form, holloed to him to go back; that he attempted to do so, but was caught by the car before he could get away and his right leg run over and crushed. Other circumstances will be stated from time to time as we may deem necessary in illustration of our rulings.

The appellees alleged the facts we have stated, and charged that appellant's servants, operatives of the switch train, were negligent in suddenly approaching without blowing a whistle or ringing the bell, or otherwise giving warning. These allegations the defendant denied, and alleged in turn that Lloyd Sullivan was guilty of contributory negligence in attempting to cross the switch track at the time and under the circumstances he did. Appellant further alleged that one of its switchmen, named J. C. McGuire, was, at the time of the accident, at or about the pumphouse for the purpose of giving signals to the operatives of the locomotive backing the train, and that he observed Lloyd Sullivan approaching the track and holloed to him, warning him against doing so, at the same time running towards Lloyd Sullivan in the effort to catch and stop him, which, as McGuire testified, he almost, but not quite, succeeded in doing. The verdict of the jury upon all issues was in appellees' favor.

Addressing ourselves to the questions and related questions in the order of importance, rather than in the order of presentation, we will first notice the questions presented under appellant's seventh assignment of error.

[1] Under the common law, actions for personal injuries abated upon the death of the injured person, but we have a statute which so alters the rule as that such action, not resulting in death, survives the death of the injured party for the benefit of his heirs or legal representatives. See Revised Statutes 1911, art. 5686. It was under the operation of this article alone that appellees could have hope of a recovery, for it is undisputed that Lloyd Sullivan was an afflicted dependent, because of which the father and mother were without right of recovery on account of loss in wages or other contribution. It is also undisputed that Lloyd Sullivan died as a result of abscesses which formed upon the bone of the injured leg, the leg having been amputated soon after the injury by the car. But the controverted issue was whether the bone abscesses were caused by the injury inflicted by the railway company in May, 1913, or by a fall from a wheel chair in May, 1914. On the second trial in September, 1914, while the suit was being prosecuted in the name of Lloyd Sullivan, the plaintiff's petition contained the following allegation:

"That by reason of the injuries so inflicted upon the plaintiff by the carelessness and negligence of the defendant, its agents, servants, and employés aforesaid, the plaintiff was confined to his bed for a period of two months, and had to have his leg amputated three times, and the plaintiff was thereby rendered a hopeless and helpless cripple for life, and the stump of his leg has never healed, and he is still suffering therefrom, and has been compelled to have several surgical operations performed thereon, and has ever since, by reason thereof, suffered intense pain and mental anguish."

This petition was sworn to by the appellee, G. W. Sullivan, and his testimony upon that trial, as also the testimony of the other appellee Mrs. Lillie Sullivan and of the attending physician, who was a relative, Dr. Rice, all supported the allegations so quoted. That trial resulted in a verdict and judgment in favor of Lloyd Sullivan for $6,500. After Lloyd Sullivan's death, appellees presented an amended petition, upon which the last trial proceeded, and in which, after describing the injuries to Lloyd Sullivan, etc., it was further charged:

"That the injury so inflicted upon the said Lloyd Sullivan as aforesaid, was one not resulting in death, and he died from another cause. * * * That the plaintiff George W. Sullivan is the father of the said Lloyd Sullivan, deceased, and that the plaintiff Lillie Sullivan is his mother, and the said Lloyd Sullivan died without issue, and the plaintiffs are his sole heirs at law."

The testimony of appellees and of Dr. Rice on the last trial also supported the amended allegations, and appellant insists under one of its assignments that the verdict and judgment, supported by sources so discredited and upon witnesses who in giving their testimony are so manifestly influenced and controlled by what the immediate necessities of the case demand, should not be permitted to stand. On the last trial it was shown by a number of witnesses that in May, 1914, Lloyd Sullivan had a fall from a wheel chair, with which he had been provided, and which at the time and later seemed to cause him very much pain, and which, as indicated by the testimony of Dr. Rice and also by Dr. Sullivan, might have caused the abscesses from which Lloyd Sullivan died. On said second trial appellee Mrs. Lillie Sullivan, in answer to a question, testified:

"Yes; we had a rolling chair for him, and then his limb began to pain him and, rise, and he got so he couldn't go in it any longer. Q. When was it that the limb began to pain him and rise? A. In February the first time. Q. Of this year (meaning 1914)? A. Of this year; yes, sir. Q. Now, how has he been since that? A. Well, from February to May he didn't suffer continuously, but just maybe a few days and at night, and maybe a few nights at a time, but after about the 20th of May of this year he hasn't seen a well minute; he has suffered constantly ever since the 20th of May."

On the last trial she thus explains the testimony just quoted:

"Will say I made that statement that the trouble began in February, but I never had been on the witness stand before, and I was nervous and confused and worried and grieved and told Mr. ———— (one of her counsel) after I got off the stand that I had made a mistake. Yes; I made those answers, but I told Mr. ———— right away after I went off the stand, and I told him about it, and he said it would not be necessary for me to go back on the stand again, that it was not material. As to my condition at the time I told you that I had made a mistake and wanted to correct it, will say I am naturally nervous, and when anything is mentioned about

my poor boy it is almost more than I can stand —we tried so hard to save him. Yes; I am nervous and broken down now."

We do not find that this explanation was corroborated by the testimony of her counsel. Appellee G. W. Sullivan, on the last trial, testified, among other things:

"After I fixed that rolling chair for him he was improving and seemed to be in good health. As to whether or not his leg had recovered, will say it was all healed up, and we used no bandages nor nothing on it at all. It healed all right. To look all right; it looked to be sound and well. No; he did not suffer any from it then. * * * Yes; there was something happened to him after that. He turned his chair over; that was some time in May, 1914, that he turned his chair over. * * * When I got there they had the wagon off of him and he was sitting down on the ground there with both hands around his leg like this (indicating, holding leg with both hands), gripping his leg, and I asked him if he was hurt, and he said that he was. * * * I don't believe he was ever out on his chair any more after that."

This witness manifested considerable hesitation in identifying his signature to the verified petition upon which the second trial proceeded. He testified:

"As to whether I made affidavit to that petition which contains the following allegations (the allegations from the petition upon which the second trial proceeded and hereinbefore quoted), will say I don't remember. As to whether I did not make affidavit in the petition that this case was tried on and appealed, that the stump of Lloyd Sullivan's leg had never healed, will say I don't remember. Yes; I remember swearing to the petition. Yes; I remember holding up my right hand and solemnly swearing the allegations in that petition were true. As to whether I swore to it without knowing that was alleged, will say I signed it because they asked me to, and I thought it was all right. As to whether I signed it and swore to it without knowing what was in the petition, or whether the allegations in it were true, or not, will say, of course, I didn't know it all. As to whether I didn't know about those allegations, will say I don't remember about it. No. I don't know anything about that. I know I never read the petition. * * * Certainly, the petition which you say contains 10 pages, 21 paragraphs, was not written by me; it was written by my lawyers."

He further testified that the petition had been signed at the instance of his attorneys, and that he signed it to the best of his "knowledge and belief," and that he was "not a lawyer." He further testified that this was his first lawsuit, and he depended upon his counsel; that they told him to "swear to it, and he swore to it."

Dr. Rice's testimony upon the last trial is too lengthy to set out. It is perhaps susceptible, however, of the construction that when he testified upon the second trial he had not had his attention definitely called to the second injury of Lloyd Sullivan's injured limb in May, 1914. He testified to the effect that in the absence of a history of such injury, he would yet be inclined to the opinion that Lloyd Sullivan's death was caused by the original injury, and that in testifying, if he did so, upon the second trial, to the effect that the abscesses then shown were a proba-

ble result of the original injury, he meant that the original injury was indirectly so.

It cannot be said that this change of base on the part of appellees is calculated to create a favorable impression; and, if the verdict and judgment rested alone upon the testimony of appellees, we might feel inclined to support appellant's contention relating to the subject. For on the second trial the evidence that Lloyd Sullivan's injury continued to inflict pain was undoubtedly material on the issue of the amount of damages to be awarded, but otherwise than as material in the way of augmenting damages, the question was immaterial, and the jury may have thought that the particular issue upon which the case was made to turn upon the last trial was only incidentally in mind of the witnesses, and not emphasized by counsel, and therefore may have credited the explanations given by appellees. Moreover, upon the last trial Dr. Sullivan for the first time testified. While it seems that he was distantly related to one of the appellees, G. W. Sullivan, who was the doctor's great-uncle, we find nothing to cast suspicion upon his testimony, and he testified to the effect that he had seen and observed Lloyd Sullivan after he had been first discharged by Dr. Rice, about a month and a half after the original injury, and that he had then apparently recovered from the effects of the wounds caused by the car "as far as a man could that had his leg off." He further testified that:

"The condition of his health was good as far as I could see after he recovered as I say."

He also testified that in June, 1914, he had been called in to see Lloyd Sullivan, and that:

"My diagnosis of it was that he had an abscess, and it was my opinion at that time that he had bruised it in some way—bruised the stump— * * * Lloyd Sullivan is dead; he died along about Christmas, I believe the 23d of December, 1914. I believe his death was caused by septic troubles—septicæmia or absorption from that abscess. In my opinion the abscesses were caused by a bruise received at some time subsequent to the accident."

He further testified that:

"If the railroad injury had left septic poisoning, or an injury to the bone that would have produced it, in my opinion it would not have taken this length of time to develop. I think it would have come in a very short while. When I first formed my opinion that some injury had intervened and caused it, I did not have any history about the subsequent injury at all. Nobody had told me that he had received an injury or bruise when I examined him—I hadn't been told that at all."

A Mrs. Smith, sister of appellee Mrs. Lillie Sullivan, for the first time also testified, to the effect that:

After Lloyd Sullivan had returned home from the sanitarium (about a month after the original injury), "he appeared to be perfectly well after he got out. I examined his limb after he got out. It appeared to be well. I do not think he suffered any after he got out after he went to going around in his wheel chair. He never

complained. After he got to going around in his chair, his general appearance and health seemed to me to be better. * * * He was never able to be out any more after he fell and hurt that limb."

A Mr. T. S. Wheeler testified to the effect:

That he had been living at Sanger since 1887 and knew the deceased in his lifetime, and remembered the occasion of his being hurt on the railroad in May, 1913; that he knew "that he recovered and got out after receiving that injury; I seen him in town after that with his chair, riding over town. Sometimes I would see him maybe for three or four days straight along —I would be in town, and he would be down there at the store, come down by himself."

The witness then testified to Lloyd Sullivan's subsequent injury in May, 1914, in the overturning of his chair which he, Wheeler, witnessed, and further testified that he never thereafter saw Lloyd Sullivan out on his chair.

Gordon Sullivan, 20 years old and a brother of the deceased, Lloyd Sullivan, also for the first time testified upon the last trial. He said:

"After he, Lloyd Sullivan, came back from Gainesville he recovered from the effects of that injury in about a month. He got out and went to going around. He had a rolling chair fixed up for him to get around. * * * He was in perfect health after he got out and went to riding in that chair. I know that Lloyd received another injury after he got his health, and went around, when he turned over he bruised that limb again. * * * It hurt him a great deal. After that the limb began to rise, and we called in Dr. Sullivan and Dr. Rice, and they kept lancing it, and it kept rising, and it never healed any more."

[2] On the whole, therefore, we think the subject was properly submitted as an issue for the jury's determination, and this was done by the court in the following language:

"If you find and believe from the evidence that the death of the original plaintiff herein, Lloyd Sullivan, was proximately caused by the injuries he received when he was struck by the car at Sanger, about which evidence has been introduced before you, then these plaintiffs cannot recover anything, and you will find in favor of defendant."

The contradictory statements of appellees and of Dr. Rice, if any, were before the jury, together with the explanations given by these witnesses, as also the evidence of other witnesses, and we cannot say that the verdict of the jury thereon must be set aside on the grounds urged by appellant as stated in the beginning of this discussion.

[3] In this connection, however, we desire to call attention to an objection made to the testimony of Gordon Sullivan. By referring back to his testimony as already quoted, it will be seen that, among other things, he testified that after Lloyd Sullivan returned from the sanitarium and got to riding in his wheel chair "he was in perfect health." To this statement appellant objected upon the ground that it was the expression of an opinion and conclusion of a nonexpert, and irrelevant and incompetent. The court, however, overruled the objection. Without determining whether or not of itself the error

was sufficient to cause a reversal, we think the ruling was wrong, and perhaps prejudicial under the circumstances of this particular case. The testimony of the physicians tended to show that the abscesses causing the septic poison which resulted in Lloyd Sullivan's death were induced by a diseased or injured condition of the bone in Lloyd Sullivan's injured leg, and whether the original or the subsequent injury caused the abscesses was the closely contested issue, and it was going beyond the province of a nonexpert witness to state that Lloyd Sullivan had, soon after the first injury, regained "perfect health," which, in view of the issue, comprehended the idea that the bone of the leg had entirely healed long prior to Lloyd Sullivan's injury in the fall from his rolling chair. Such an opinion, we think, was admissible only on the part of an expert. Gordon Sullivan was a nonexpert, and as such could only properly testify, as did several other witnesses to whose testimony no objection was urged, as to Lloyd Sullivan's apparent general health, absence of complaint, and to other circumstances within the range of common observation, which, together with expert testimony, if any, would be proper for the consideration of a jury in determining whether Lloyd Sullivan's death was in fact the proximate result of the first or of the second injury. See Jones' Blue Book of Evidence, vol. 2, § 359, and 11 R. C. L. p. 590, where the subject is discussed.

In this connection also we are inclined to the view that the following special instruction, requested by the defendant and refused by the court, should have been given:

"You are instructed in this case that by proximate cause is not necessarily meant the cause or condition which is nearest in time or space to the result which follows; and, even though you may believe in this case that after the injury sustained by Lloyd Sullivan in having his leg cut off he thereafter fell and injured the stump of such limb, still, if you further believe that the effect, if any, of the injury received by the said Lloyd Sullivan at the time he fell, if he did so, after the original injury was inflicted, was slight only, and that the active and efficient and procuring cause of the said Lloyd Sullivan's death was the injury received at the time he was run over by the defendant's cars, you will find for the defendant without reference to any other issue in the case, and so say by your verdict."

[4] As it seems to us, it was the right of the defendant to have placed before the jury in an affirmative form the law arising from the specific circumstances recited.

Under another assignment appellant insists that the court erred in refusing to give a peremptory instruction on the ground that it conclusively appears from the testimony that Lloyd Sullivan was guilty of contributory negligence in entering upon appellant's track at the time and under the circumstances of his injury. Under substantially the same evidence appellant on its second appeal presented under its seventeenth assignment of error the same proposition, and it

was then overruled. At that time we did not discuss the testimony, but contented ourselves with stating that we did not think the evidence "on either of the issues of defendant's liability or of plaintiff's contributory negligence" such as to require the peremptory instruction to find in appellant's favor, as was requested. Under such circumstances, it would be rare indeed that an appellate tribunal would feel called upon to declare a ruling of the court erroneous which, on appeal, had been approved and which later the trial judge followed, and we probably would be entirely justified in disposing of the assignment under consideration without further reference, except for the earnestness with which the contention is presented, and the fact that the discussion will probably illustrate conclusions hereinafter announced. We will therefore briefly present our view upon the state of the evidence relating to the issue of contributory negligence.

[5] Appellant's contention is to the effect that Lloyd Sullivan either did not look for the train before he started from the coal bin to cross the house track, as he testified, or that if he did so, he voluntarily and heedlessly approached and attempted to cross the track immediately in front of the approaching train. While appellant's witnesses testified to a state of facts tending to show that Lloyd Sullivan received warning of the approaching train, both from the switchman, McGuire, and by the ringing of the bell and blowing of the whistle, yet this testimony was either directly or inferentially refuted by witnesses in behalf of the plaintiffs, and the conflict was clearly for the jury's determination. Assuming, therefore, as in aid of the verdict we should do, that no warning was given, and that Lloyd Sullivan did look for the location of the switch train before leaving the coal bin, it cannot be said as a matter of law that a jury might not reasonably infer that at the particular time Lloyd Sullivan turned toward the pathway leading from the pumphouse in the direction of his home, the engine and train were standing still, as one construction of Lloyd Sullivan's testimony perhaps indicates, and that, therefore, in the absence of any warning Lloyd Sullivan might, in the exercise of ordinary care, have concluded that he could safely cross the track, which at most was but 15 or 20 feet away. It is true, as appellant contends, if the testimony be so construed, it is, apparently at least, altogether improbable that the train from below the depot could have traversed the intervening 255 feet, as shown by the testimony, in time to have run over Lloyd Sullivan had he continued his journey with reasonable care and diligence, but, as stated·in the beginning of this opinion, it is not very clear from Lloyd Sullivan's testimony that it was not the engine that Lloyd Sullivan saw down about the depot. If it was the engine instead of the cars to which he referred, then there was some seven or eight cars

attached to the engine that extended north from the depot along the switch track, which would bring the train much closer to the car, which had been spotted in front of the stock pens, and which ran over Lloyd Sullivan. But even in that phase of the testimony, if the train in fact was standing, as is, perhaps, not an unreasonable inference from Lloyd Sullivan's testimony, which was reproduced upon the last trial, and there was no warning given, it would still be for the jury, we think, to say whether Lloyd Sullivan was guilty of contributory negligence in not again looking to see whether or not the train was approaching, for the evidence tends to show that in turning towards the pathway across the house track, he necessarily left the depot and the train, whether standing or in motion, to his left and a little behind, and the proof shows that he was afflicted in his limbs so as to deprive him of the free and rapid motion; his walk, as some of the testimony indicates, was slow and somewhat difficult; there was a slight curve also from the depot to the path crossing, and the engine could not be seen from where Lloyd Sullivan entered upon the track.

[6] Then, too, it is not impossible that after his entrance upon the track, his forward progress was arrested by the exclamation of June Teacle to "go back; go back!" This exclamation and the resultant effort on the part of Lloyd Sullivan to retrace his steps may possibly have been the immediate cause of his being run over. These were all, as it seems to us, theories presented by the evidence, and we think it was for the jury rather than the court to determine the issue of whether or not Lloyd Sullivan was guilty of contributory negligence under all of the circumstances at the time. It is a rule established by many of our authorities that, in order to authorize the court to withdraw the case from the jury by a peremptory instruction, the evidence tending to establish contributory negligence, must, in the absence of a statutory violation, be of such character as that there is no room for ordinary minds to differ in the conclusion to be drawn therefrom. See Hancock v. G., C. & S. F. Ry. Co., 99 Tex. 613, 92 S. W. 456, and cases therein cited. It has also been held that the mere failure to look and listen for the approach of a train is not negligence per se, and cannot be treated as such by the court, though it may be so declared by a jury under the circumstances of the case. See El Paso Electric Co. v. Kendall, 78 S. W. 1081; S. A. & A. P. Ry. Co. v. Long, 4 Tex. Civ. App. 497, 23 S. W. 499. We are of opinion, therefore, that the court did not commit reversible error in submitting the issue of contributory negligence.

[7] In this connection we should mention the fact that the court submitted the issue of Lloyd Sullivan's contributory·negligence in general terms only, and that appellant requested a special instruction, attempting to

apply the law of contributory negligence to the facts as pleaded by it. It is too late to now question the right of a defendant upon request to have an affirmative presentation of the facts well pleaded and relied upon by him in support of a plea of contributory negligence, if the evidence tends to show a state of facts as so alleged, which fairly supports an inference of negligence. See Wells Fargo Express Co. v. Benjamin, 179 S. W. 513; F. W. & D. C. Ry. Co. v. McCrummen, 133 S. W. 900, and cases therein cited.

[8] The court, however, is not required to give a charge that is inaccurate, and an examination of the special charge, to the refusal of which error has been assigned in this case, shows, as we think, that it was objectionable in that it assumed, in the first instance, that Lloyd Sullivan did not look and listen for the train that approached, as he testified that he did. It further assumes, in effect, that if Lloyd Sullivan attempted to cross the track under the circumstances pleaded and recited in the charge, it would constitute negligence, whereas this was for the jury to determine from all of the evidence before it. The special charge further assumed that, if Lloyd Sullivan approached the track and was run over under the circumstances recited, the result was the proximate cause of his negligence; whereas this also was for the jury; particularly in view of the testimony hereinbefore referred to, possibly indicating that Lloyd Sullivan's progress was interrupted by the sudden exclamation of June Teacle, and that this act on the part of Teacle, co-operating with the negligence of the operatives of the train in failing to give warning of its approach, may possibly have been the proximate cause.

A further special instruction on the issue of contributory negligence was requested by appellant, which embodied circumstances included in the special charge just disposed of, and also included a reference to the alleged warning given by the brakeman, McGuire, but this charge also, as we think, was likewise objectionable, in that it assumed that Lloyd Sullivan, at the time he started towards and across defendant's track, did not look and listen, nor did the charge require a finding on the part of the jury that the circumstances recited did constitute negligence, but assumed, in effect, that if Lloyd Sullivan did attempt to cross the track under the circumstances recited, that it would constitute negligence as a matter of law. The charge was therefore properly rejected.

[9] Error has been assigned to the following portion of the court's charge:

"Now, if you find and believe from the evidence that at the time alleged in plaintiffs' petition, that the deceased, Lloyd Sullivan, was passing over the defendant's track at the place where people generally passed over the same in going to and from the water plant, as mentioned in paragraph 6, if you find that the people did so pass over said track as so explained therein, and you further find that in so passing over the same that he was struck by a car being backed or moved by the train which was being switched at such place of Sanger, and you further find that defendant company did not have a watchman on said backing cars to discover any person or persons who might be on said track at the place passing across the same, or if you find that said employés operating said train failed to give any signal of the backing of said train, such as ringing the bell, or blowing the whistle, just prior to the accident, and you further find that deceased, Lloyd Sullivan, was not guilty of contributory negligence, as explained in section 8 hereof, or section 6 above, and you further find that either the failure to keep a watchman on said cars so being backed, if they did so fail, or failure to give some signal of the approach of the train, such as ringing the bell or blowing the whistle, if they did so fail, was negligence on the part of the operatives of said train, and you further find that such negligence, if any, was the proximate cause of the deceased Lloyd Sullivan's injuries, and you further find that said injuries, viz. having his leg run over by said train, did not proximately cause his death, then you will find in favor of the plaintiffs, unless you further find for the defendant under other sections of this charge."

We think this charge is erroneous, in that its effect was to inform the jury that, if the defendants had no watchman on the cars or gave no signal by bell or whistle, the defendant would be liable under other conditions there stated, even though the defendant had exercised ordinary care in other respects, and even though Lloyd Sullivan may have had sufficient warning through other sources. It was undisputed that there was no watchman upon the backing train, and it may be true that the operatives of the train failed to give any signal of its backing, such as ringing the bell or blowing the whistle, just prior to the accident, yet if in fact the brakeman, McGuire, as he testified, warned the deceased as he started towards the track and deceased heard him in time to have availed himself of the warning, all of which was for the jury to determine, then the fact that there was no watchman on the car, and that no warning signal had been given by bell or whistle, would not necessarily be material. The defendant had the right to have the jury determine from all of the facts whether the defendant exercised ordinary care to give warning, in any way in which it might be done, of the approach of the cars, and the charge objected to is affirmatively erroneous in excluding the effect that might have been given to the warning, if any, given by the brakeman, McGuire.

We are of the opinion that there was error also in permitting the introduction of a part of the testimony of appellees' witness Joe Warren. On the trial, Joe Warren, the negro helper of June Teacle, standing upon the platform of the stock pens, testified that he, as well as June Teacle, holloed to Lloyd Sullivan. He further testified that he did not hear the brakeman McGuire halloo to Lloyd Sullivan; that he never heard the brakeman say a word, and that he had not theretofore so testified. On cross-examination, and for

the purpose of impeachment, the defendant offered the following portion of the testimony of Joe Warren, given upon the first trial of the case in 1913:

"Q. How did you tell him to go back? A. I said 'The train is going to back up here; you had better look out.' Q. Did you halloo at him? A. No, sir; not in a distressing way, because I thought that he could get out of the way. Q. Didn't you see the brakeman there at that time? A. The brakeman was on the same side he was on. Q. On the same side Lloyd Sullivan was on? A. Yes, sir. Q. Did he run towards Lloyd Sullivan? A. He did after the train had very near caught him; he run toward him. Q. You saw him run toward him before he was struck? A. Yes, sir. Q. Did you hear the brakeman halloo at him? A. Yes, the brakeman said you are going to get hurt, or something like that. Q. Was he running? A. Yes, sir; he was running then. Q. He told him he was going to get hurt if he didn't look out? A. Yes, sir. Q. Could you see the brakeman standing out close to the coal bin just when Lloyd Sullivan started? A. Yes, sir. Q. Did you see the brakeman give the stop signal then? A. No, sir. Q. Were you looking at him? A. No, I wasn't watching him; I was watching Lloyd Sullivan. Q. You don't know whether he gave the stop signal then or not—the only stop signal you saw him give was after the train had struck him? A. It was just before it struck him. Q. You saw the brakeman give the stop signal just before the train struck him? A. Yes, sir."

Thereafter the plaintiffs, in corroboration of the witness, offered, over the appellant's objection, the following portion of the testimony of Joe Warren, given on the second trial of this case, in September, 1914:

"I always try to remember things. Yes: I tried on the last trial to remember. No; there is no reason that I should remember any more now than I did then. I don't undertake to say whether I did or didn't make that answer on the last trial. As to whether I was asked this and made the following answer: 'Did you hear the brakeman holler at him? A. Yes; the brakeman said, 'You are going to get hurt,' or something like that; will say that was Mr. Teacle. If I made that answer, I was trying to repeat what Mr. Teacle said; not the brakeman, but Mr. Teacle. You got that wrong there; not the brakeman—Mr. Teacle, I meant to say."

[10] To the testimony so given in corroboration the defendant objected, to the effect that it was irrelevant and incompetent, and as indicated, we think the objection should have been sustained. It is said in 40 Cyc. 2787, that:

"As a general rule, a witness cannot be corroborated by proof that on previous occasions he has made the same statements as those made in his testimony, and the rule is the same whether the previous statements were made verbally or in writing, and applies equally to statements under oath and unsworn statements."

On the same subject our Supreme Court in the case of Insurance Co. v. Eastman, 95 Tex. 34, 64 S. W. 863, said:

"Upon the subject of admitting the testimony of the former declarations of a witness in sup-port of his testimony given upon the trial, there is a great contrariety of opinion as to the circumstances which render such admission proper. But two rules are reasonably well established: (1) That in the absence of evidence impeaching the credibility of a witness, such testimony is never admissible. Moody v. Gardner, 42 Tex. 414. (2) That whenever a witness is sought to be impeached by showing that he has made declarations inconsistent with the testimony given by him upon the trial, and the tendency of such impeaching evidence is to show that the testimony of the witness is, by reason of some motive existing at the time of the trial or of some influence then operating upon him, fabricated, it is proper to admit evidence of his former declarations which corroborate his testimony, provided such declarations were made at a time when no such motive or influence existed."

As it seems to us, it is quite clear that the corroborating evidence offered is not brought within the exception indicated in the quotation we have just made, and which is supported by numerous authorities, that is to say, Joe Warren, having been impeached by the introduction of contradictory statements given by the witness on the first trial, could not corroborate the testimony given by him upon the last trial to the contrary by proving that upon the second trial he had testified in harmony with his evidence upon the last trial; it not appearing in any way that the motive, if any, which induced the witness to testify falsely upon the last trial, if he did so, did not exist with like force at the time of his testimony upon the second trial when the corroborating evidence was given. It further appears in the evidence that Joe Warren was an employé of the appellee G. W. Sullivan at the time of the accident to Lloyd Sullivan, having temporarily been loaned to June Teacle for the purpose of loading the mules. What other or later connection, if any, between the witness and appellee G. W. Sullivan does not appear, but we think the testimony of the witness upon the last trial, together with the impeaching testimony, and such explanation, if any, as the witness could make at the time of impeachment, should all be left to the jury, without the supporting aid of the fact improperly proven that he gave a consistent explanation a year before. See Vicars v. G., C. & S. F. Ry. Co., 37 Tex. Civ. App. 500, 84 S. W. 286; F. W. & D. C. Ry. Co. v. Stone, 25 S. W. 808.

Appellant urges a number of assignments presenting other questions, but they have no such applicability to the case, nor such importance, as makes it necessary in our opinion to discuss them. All assignments, except as hereinabove indicated, are therefore overruled. But for the errors noted the judgment will be reversed, and the cause remanded.

Reversed and remanded.