## JAMES E. TRYON v. THE EVENING NEWS ASSOCIATION.

*Newspapers—Libels upon private parties.*

It is libelous to publish to the injury of a newspaper reporter an untrue statement showing that he has violated a private confidence by tale-bearing.

All newspaper mention of private persons must be made under the private obligation of publishing no untruths to their prejudice, and the public obligation of saying nothing at all to their prejudice unless on adequate occasion. Otherwise the statements made may be libelous even though they would not be actionable if unwritten.

One who publishes an untrue article intended and reasonably adapted to harm the person to whom it refers, is liable in such damages as may be lawfully awarded according to the determination of a jury as to the injury done and its compensation.

Error to Superior Court of Detroit. Submitted October 9. Decided November 21.

TRESPASS ON THE CASE for libel. Plaintiff brings error.

*Maybury & Conely* for plaintiff in error.

*Henry W. Montrose* and *C. I. Walker* for defendant in error, cited as illustrations of newspaper statements unpleasant to a sensitive man, and yet not libelous, *People v. Jerome,* 1 Mich., 142; *Stone v. Cooper,* 2 Den., 272; *Homer v. Engelhardt,* 117 Mass., 539.

CAMPBELL, C. J. Tryon sued the defendants in the Superior Court of Detroit for a libel published in the

Detroit Evening News in the following terms, connected in some of the counts in the declaration with various colloquies and innuendoes:

"When Capt. W. H. Myler of the Police force cautioned his men against giving news to the reporters, it had no effect whatever: the papers got the news just as promptly and just as correctly as before, and Mr. Myler was taught how useless it was for him to try and smother up the misdoings of favorites. Now, however, a real blow has been struck at local journalism in Detroit which will have its effect especially upon the Tribune and may injure all the other papers more or less. It is the action of Tryon, a reporter of the Tribune. On no other journal in the city could such a thing have been possible. Tryon insinuated himself into the good graces of Sergeant George H. Thomas of the central station, and learned from him his private opinion of various matters and things connected with the Police Department. In the course of the conversation, which was free and easy, Sergeant Thomas made many remarks concerning the department, principally in jest. These and the remainder of the conversation the Tribune reporter carried directly to Police Headquarters, and charges were promptly preferred against Sergeant Thomas. At the trial yesterday afternoon Sergeant Thomas frankly confessed to having made the statements alleged, but explained how and why he made them, and that there was not the least malice in the affair or any attempt to prejudice the men against their superior officer or to injure any man of the force. The explanation was not satisfactory to the Board, and Sergeant Thomas was suspended from duty for one month. There is not a patrolman on the force who does not symathize with Thomas and who does not condemn the reporter who made public a private conversation."

The case having been brought to trial in the Superior Court of Detroit and the publication proved and not justified, the court directed a verdict to be rendered for the defendant. The ground of this ruling was necessarily that the article was not libelous.

It is not claimed that verbal statements of the kind contained in the printed article would be slanderous and actionable in themselves without proof of special damage. But it is claimed by plaintiff that when such remarks are reduced to writing and published in print

in a newspaper they become actionable. Defendants insist there is nothing in the paper which is in any way injurious.

The only criterion which can be applied is whether this article had in fact any tendency to injure the plaintiff or bring ridicule, blame or contempt upon him.

There can be no pretense that there is any privilege belonging to such cases. The general public to whose entertainment or instruction all newspapers are supposed to be devoted, has no concern whatever with the lawful doings and affairs of private persons; and all mention of them in print must be made under the private obligation of publishing no untruths to their prejudice, and the public obligation of saying nothing to their prejudice at all unless upon adequate occasion. Where this duty is violated an action lies for many things where an unwritten slander would not be actionable, for the manifest reason, well recognized in law as well as in general sentiment, that such defamation is made more permanent, and obtains greater publicity, and may operate to prejudice large numbers of people or whole communities against the person injured, with no adequate means of undoing the mischief.

In determining what is libelous it is not possible for courts to declare in advance just what words or charges or subjects must be included in the article complained of. The same words or the same averments may be, according to their purpose and surroundings, or according to their use sincerely or ironically, very harmless or very injurious. In Gen. Hamilton's celebrated argument for the defense in the case of *People v. Croswell*, 3 Johns. Cas., 337, which has for some purposes been regarded as of almost judicial authority, he laid much stress on the impossibility of determining the intrinsic guilt or innocence of particular language, without reference to its purpose or tendency in the particular case; and remarked that even "texts taken from the holy scriptures,

and scattered among the people, may, in certain times, and under certain circumstances, become libellous, nay, treasonable. These texts are, then, innocent, libellous, or treasonable, according to the time and intent." The whole subject is to be governed by good sense and ordinary understanding, and questions must be decided naturally and not according to metaphysical or technical methods which ignore the real meaning and bearings of the language which is used by those who have made statements in print about their neighbors. If an article is published which is untrue and intended and reasonably adapted to harm the person to whom it refers, it is an unlawful publication, and its publisher is liable to answer for it in such damages as may be lawfully awarded. The amount of injury and the amount of compensation for it, must be determined by the jury as judges of the facts.

In the present case the article intimates that the action of plaintiff, who is a newspaper reporter, was so extraordinary that it could not have been possible except by a person employed on his own journal. It charges him with insinuating himself into the good graces of a police sergeant on a force which had been cautioned against giving news to reporters, and learning from that officer his private opinion of various matters and things concerning the Police Department, and, in that conversation, which was free and easy, hearing many remarks, principally in jest, concerning the department. It charges him with at once carrying those remarks to headquarters, resulting in the expulsion of Thomas from his place, and states that there is not a patrolman who does not sympathize with Thomas and condemn plaintiff.

No one can read this article without seeing that it is intended not only to censure plaintiff but to hold him up as having done a very mean thing. Assuming, which perhaps is possible, that private remarks made by a police officer about his department and its officials may be of such a nature that duty requires every one

who hears them to at once bear the tale to headquarters, it is very certain that this duty is not universal, and that this article meant it to be understood that in the case of the plaintiff he was not acting under any such duty. If the article had contained no unpleasant insinuations, and had merely stated the fact that Thomas had in private conversation made statements that were described, and that plaintiff had carried them to headquarters, it might possibly have appeared that he was blameless. Here, however, the statements so reported are not specified, and the article plainly intimates they should not have been reported. It is quite clear that while there may be some reason for requiring a certain amount of care in the members of a police force to avoid such acts or remarks as will injure their usefulness, or that of the force, it is equally true that as men and citizens they lose none of their rights to think and express their thoughts, where such expression is not calculated to interfere with their duty.

Every man often says in the freedom of private and friendly intercourse things which, although true in all respects, he would never think of making public. The talebearer who reveals such secrets—whether cautioned against doing so or not,—is generally thought to be a very contemptible creature. At the common law a person who stealthily listened to private conversation and then made mischief by it, was indictable as an eavesdropper, and held to be a public nuisance. One who has so much respect paid to his supposed decency, as to be allowed to listen without lurking in a concealed listening place, and then abuses his privileges, is not usually thought to be any better.

In practically asserting so strongly as this article implies, the duty of discretion, and the necessity to a reporter of avoiding the violation of social confidence, its tone is praiseworthy, but this very fact makes the charge on plaintiff injurious. The necessity of frequently meeting members of the great body of reporters,

and of having more or less to say to them, would require gentlemen to be very closely on their guard, and to treat them with scanty civility unless they were understood to be generally worthy of being trusted. When a man is found wanting in this he must expect to lose his reputation and standing with the press as well as in society, and imputations of such misconduct cannot be regarded as containing no cause of complaint.

We think the article sued on was libelous. How far the grievance may extend or how much it may be mitigated by any showing is not for us to determine.

The judgment must be reversed with costs and a new trial granted.

The other Justices concurred.