## PROVIDENCE–WASHINGTON INS. CO. v. OWENS. (No. 8868.)

(Court of Civil Appeals of Texas. Ft. Worth. June 1, 1918. Rehearing Denied Oct. 26, 1918.)

**1. WITNESSES  414(2) — DECLARATIONS — CONFLICT IN EVIDENCE.**

That defendant's agent denied making alleged defamatory statements to plaintiff's witness, who had testified thereto, did not render admissible testimony by plaintiff and other witnesses that witness had told them that the agent had made such statements.

**2. WITNESSES  395 — IMPEACHMENT — INCONSISTENT STATEMENTS.**

That testimony of plaintiff's witness as to defendant's defamatory statements was impeached by cross-examination as to inconsistent testimony given in former deposition did not justify admission of testimony by plaintiff and other witnesses that witness had told them that defendant had made such statements.

**3. WITNESSES  318 — CORROBORATION OF UNIMPEACHED WITNESS.**

In absence of evidence impeaching credibility of a witness, testimony of former declarations of the witness in support of his testimony is never admissible.

**4. WITNESSES  395 — DECLARATIONS — IMPEACHMENT.**

Where effort is made to impeach witness by evidence of declarations inconsistent with his testimony tending to prove testimony a fabrication by reason of some influence existing at time of trial, evidence of declarations of witness corroborative of testimony made at a time when no such influence existed is admissible.

**5. WITNESSES  321 — CREDIBILITY — DEPOSITIONS.**

Party offering depositions in evidence vouches for credibility of the witness.

**6. WITNESSES  396(1) — DEPOSITIONS — CONFLICT IN TESTIMONY—EXPLANATION.**

Plaintiff, after having offered in evidence both first and second deposition of same witness, could not explain the conflict between testimony contained in first with that contained in second by evidence as to prior unsworn statements of the witness.

**7. APPEAL AND ERROR  1050(1) — HARMLESS ERROR—ADMISSION OF EVIDENCE.**

Where evidence as to whether defendant's agent made statements defamatory to plaintiff was sharply conflicting, and plaintiff's witness' testimony as to statements was inconsistent with testimony given in former deposition, the admission of evidence of declarations of such witness to corroborate his testimony that statements were made was reversible error.

**8. LIBEL AND SLANDER  123(1) — JURY QUESTION—MAKING OF REMARKS.**

In action for slander, evidence held to justify submission to jury of whether alleged defamatory remarks were made.

**9. PRINCIPAL AND AGENT  159(1)—PRINCIPAL'S LIABILITY.**

The test of principal's liability for agent's wrongful act is, not whether act was authorized or done in violation of principal's orders, but whether it was done while engaged in principal's business and within apparent scope of authority.

**10. LIBEL AND SLANDER  6(1)—"LIBELOUS PER SE."**

Defamatory words to be "libelous per se" must be of such a nature that the court can presume as a matter of law that they will tend to disgrace and degrade the party, or hold him up to public hatred, contempt, or ridicule, or cause him to be shunned and avoided.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Libel.]

**11. LIBEL AND SLANDER  86(2)—ACTION— PLEADING.**

Where alleged slanderous words are susceptible of an innocent as well as a defamatory meaning, plaintiff should allege use of words in a defamatory sense, and also that words conveyed defamatory meaning to hearers.

**12. LIBEL AND SLANDER  6(2), 9(1)—DEFAMATORY WORDS.**

Where alleged slanderous words charged plaintiff, who was holder of blank policy, with issuing unauthorized certificates, plaintiff was required to prove special damages; such words not being defamatory as a matter of law, as charging an act involving moral turpitude, reflecting on business integrity, or calculated to impair business standing.

**13. DAMAGES  40(1) — PROFITS — OTHER BUSINESS.**

In action for slander and for wrongful interference in contractual relations, resulting in tie-up of plaintiff's shipment of cotton, damages cannot be recovered for loss of profits plaintiff might have made by engaging in other business during period of tie-up, instead of devoting his time to effort to settle shipment controversy; such damages being too remote and speculative.

**14. LIBEL AND SLANDER  119 — MENTAL SUFFERING.**

In action for slander, damages cannot be recovered for mental distress, not the direct result and proximate effect upon his mind and feelings of alleged slanderous statement.

**15. LIBEL AND SLANDER  112(1)—SUFFICIENCY OF EVIDENCE.**

In action against insurance company for resulting tie-up of plaintiff's shipment because of alleged slanderous statements, evidence held to warrant finding that defendant's agent did not intend to state, and financial backer did not understand, that no reinsurance had been obtained.

---

 For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

16. LIBEL AND SLANDER ⚖️19—CONSTRUCTION OF LANGUAGE.

Alleged defamatory language must be construed as a whole.

17. PRINCIPAL AND AGENT ⚖️124(1) — AUTHORITY—JURY QUESTIONS.

In action for slander and for wrongful interference with contractual relations, evidence *held* sufficient for submission to jury of whether alleged agent who made defamatory statement had authority from defendant to make statement.

18. LIBEL AND SLANDER ⚖️125 — ACTION—SPECIAL ISSUE.

In action for slander resulting in tie-up of plaintiff's shipment, because of alleged statements by defendant insurance company that certificates covering shipment were unauthorized and insurance had not been reinsured, evidence *held* to justify submission of special issue of whether financial backer refused to accept certificates regardless of alleged statements.

19. EVIDENCE ⚖️271(13), 318(2)—HEARSAY—SELF-SERVING DECLARATION.

In action for slander, telegram from plaintiff's agent to plaintiff, stating that third party had notified agent that defendant had made alleged defamatory remarks, was inadmissible, being hearsay, self-serving, and not binding upon defendant.

Appeal from District Court, Tarrant County; Bruce Young, Judge.

Action by Tom B. Owens against the Providence-Washington Insurance Company. Judgment for plaintiff, and defendant appeals. Reversed and remanded.

Thompson, Knight, Baker & Harris and Geo. S. Wright, all of Dallas, for appellant.

R. M. Rowland, Lassiter & Harrison, and McLean, Scott & McLean, all of Ft. Worth, for appellee.

BUCK, J. Tom B. Owens sued the Providence-Washington Insurance Company, alleging in substance as follows:

1. That plaintiff was at the time of the transactions herein mentioned engaged in the business of buying, selling, and exporting cotton under the trade-name of Tom B. Owens & Co. On September 1, 1914, defendant entered into a contract with plaintiff, by the terms of which it insured him against loss at sea of any and all cotton that plaintiff might ship, and as a part of said contract defendant delivered to plaintiff certain certificates in writing, to be used by him in the course of his business of exporting cotton. That under said contract plaintiff might, whenever he was about to make a shipment of cotton by sea, issue said certificates covering said cotton, using for that purpose the forms placed in his hands, as aforesaid, and might thus render said general contract of insurance and special contracts, evidenced by the certificates so issued, operative for the protection of that particular cotton.

2. That on December 28, 1914, plaintiff issued certificates of the kind and character, aforesaid, insuring 11,000 bales of cotton, during a voyage on the ship Dacia from Galveston, Tex., to Bremen, Germany, which action on the part of plaintiff was in pursuance of his said contract with defendant.

3. That at about the time said cotton began to be loaded on the steamship Dacia at Galveston, about January 6, 1915, defendant, through its managing officers, particularly its president, J. B. Branch, its attorneys, Harrington, Bigham & Englar, and its agent, Edwin G. Seibels, deliberately and maliciously began and continued a course of conduct calculated and intended to thwart plaintiff in his efforts to make said shipment, and to enable defendant to evade its obligation under its said contract of insurance and force a cancellation of said policy. It was specially alleged that the officers and agents aforementioned falsely, maliciously, and slanderously represented to Max May, vice president of the Guaranty Trust Company of New York, that the certificates issued by plaintiff, covering the 11,000 bales of cotton, were unauthorized by defendant, and that defendant had no reinsurance on this risk, and that plaintiff had improperly issued certificates against this shipment in so large an amount as to endanger the solvency of the defendant company and the interests of the Guaranty Trust Company, which latter company had agreed with plaintiff to finance the Dacia shipment, and which then held the aforesaid certificates of marine insurance covering said cotton. It was further alleged that exporters of cotton were required, by the necessities of their business, to have shipments like this financed by bankers, which custom was well known to defendant. That plaintiff had arranged with the Guaranty Trust Company to finance said shipment, including the advancing or guaranteeing of the freight charges due the owner of the ship and the premiums for marine insurance. That on this shipment the freight charges, alone, amounted to $175,000. That on January 21, 1915, said shipment was ready to depart from Galveston, and the certificates were in the hands of the Guaranty Trust Company, and that by reason of the false and slanderous statements above mentioned made to Max May, acting for the Guaranty Trust Company, said trust company was caused to decline to advance the freight charges or to permit the Dacia to sail until the controversy was straightened out to its satisfaction. That about this time the plaintiff agreed and decided to change the destination of the voyage from Bremen, Germany, to Rotterdam, Holland, and so notified all parties interested, and sought to change said

⚖️For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

certificates in the hands of said trust company, so as to conform to the change of destination. That, under his contract, plaintiff had the right to make this change. But that defendant wrongfully and maliciously objected to and attempted to prevent this from being done, and to that end forbade the trust company to permit such change in the certificates. That such attempts of the defendant to interfere with the plaintiff's business and cripple him therein succeeded for a time, but by January 30, 1915, plaintiff prevailed upon said trust company to recognize his rights and finance such shipment and enable the same to leave Galveston.

4. It was alleged that said false and slanderous statements, made by the defendant's attorney Bigham, to Max May, aforesaid, were made with the full knowledge and notice of all the material facts and were authorized by the defendant company through its president. That such acts and conduct on the part of defendant were intended and calculated to interfere with the contractual relations then existing between the plaintiff and the trust company. That as the direct and proximate result, contemplated and expected by defendant at the time, from such willful and malicious wrongs, the plaintiff was damaged in the following respects and amounts:

, (a) The sailing of said shipment was delayed for nine days, and the plaintiff lost the interest on his investment for said time, to his damage in the sum of $2,000.

(b) That plaintiff was caused and forced to incur great expense in the way of sending telegrams and telephones, and in the keeping of a man at Galveston to aid in removing all obstacles to the starting of the shipment, to plaintiff's damage in the sum of $1,500.

(c) That plaintiff became liable for demurrage on account of the detention of said ship for the said nine days, amounting to $9,000.

(d) That plaintiff's business as a cotton dealer was practically destroyed during said nine days, while the necessary expense of operation of his business during said time continued, for which plaintiff asked $10,000.

(e) That plaintiff's credit and reputation in the business world, in the cotton trade, and among bankers engaged in financing cotton transactions, were greatly injured, and he was caused to experience great annoyance, humiliation, and mental suffering, for which he asked $100,000.

(f) That he was entitled to exemplary damages in the sum of $50,000.

Defendant answered by a general demurrer and special exceptions, a general denial, and further pleaded in substance as follows:

That the statements alleged to have been made by defendant's agent to Max May were made to a person having a community of . business interest with defendant and were made in good faith, and hence were privileged communications; that under the usage and custom of the business, and according to the course of dealing between the plaintiff and the defendant in regard to the shipments of cotton under said contract, where plaintiff desired to make a shipment upon a boat not named in the rate sheet or to a point not noted on the rate sheet, plaintiff furnished to the defendant, either personally or by his duly authorized agent, L. A. Wight & Co., an application for permission to ship on a given boat or to such unnamed port, and requested a rate for such shipment, etc. It was further alleged that during December, 1914, the war between Germany and her allies and Great Britain and her allies was in progress, and that the harbor of Bremen and the approaches thereto were mined and hedged about by warships of Great Britain and her allies, and that the steamship Dacia was a German steamship, owned and operated by German people under German registry at the outbreak of the war, and that the same was transferred after the beginning of the war to American registry; that it was a notorious fact, known to plaintiff, that it was the war policy of Great Britain and France to refuse to recognize any change of ownership and registry of boats from German registry to neutral registry after the outbreak of the war, and it was further known to plaintiff and to all others that Great Britain, France,. and Russia had announced the intention of capturing and confiscating such boats as those that changed their registry. Other defenses were specially pleaded; but, in view of the conclusion reached by us, we do not think it necessary to further mention them.

The cause was submitted to a jury under special issues, and a verdict was rendered for plaintiff in the aggregate sum of $102,964.12, upon which verdict the court rendered judgment. The items making up this judgment were as follows:

Interest, $1,148.42; expenses for telegrams and telephones, etc., $202.90; demurrage ·for the nine days, $1,620; loss of net profits during said period, $10,000; injury to credit, standing, and reputation, $50,000; mental suffering, $25,000; exemplary damages, $15,000.·

The record in this case is perhaps the most voluminous of any heretofore filed in this court. The transcript consists of 719 pages; the statement of facts of 445 pages; appellant's brief of 665 pages, including 121 assignments of error and numerous propositions under almost every one. Hence it will be readily recognized that the consideration of this appeal has called for the expenditure of much time and the examination of a multitude of authorities. It would be impracticable for us to attempt to discuss each assignment presented, and yet keep the opinion within proper limits. Nor do we

find it necessary so to do, and will as far as possible group the assignments involving the same or kindred questions of law. For instance, the first seventeen assignments are directed to the action of the court in admitting over the objection of defendant testimony of plaintiff and third parties as to what Max May, of the Guaranty Trust Company, had told said witnesses about the statements ·claimed to have been made by Henry J. Bigham to said May, to the effect that the certificates of insurance on the Dacia in the amount named were unauthorized, and that the Providence-Washington Insurance Company did not have any reinsurance on said shipment. Under this group of assignments, it is shown that the testimony of plaintiff himself, and witness Parker, Robert Harrison, plaintiff's. attorney, and others, was admitted, said witnesses testifying as to statements made to them by Max May to the effect that Bigham, attorney for the defendant, had stated to May that the issuance of the certificates on the Dacia by plaintiff was unauthorized, and that the Providence-Washington Insurance Company had no reinsurance on the shipment of cotton. To all of this testimony the defendant objected, on the grounds that it was incompetent, prejudicial, hearsay, and that it was an effort to impeach the plaintiff's witness Max May, etc. Two depositions of the witness Max May were taken by plaintiff, one dated October 19, 1916, and the other February 8, 1917. Both were offered in evidence by plaintiff. In the first deposition the witness failed to state that Bigham had told him on the occasion of Bigham's visit to the Guaranty Trust Company, about January 21, 1915, that plaintiff was not authorized to issue the certificates of insurance in the amount therein provided, and, further, the witness did not state positively that Bigham in that conversation had stated to him that the plaintiff had not been able to secure any reinsurance on the shipment. From the following quotations from May's first deposition the character and purport of the testimony in the two respects indicated may be seen, to wit:

"Now, I quote this conversation from memory, because there is nothing in our books or records to show exactly what Mr. Bigham said to me, and I quote to the best of my knowledge and recollection. He said, of course, his company was a comparatively small company; that the amount of insurance we were carrying in that company, for a bank like ours, was undoubtedly too large; and I fully agreed with him. He said that Owens, while he had a blank policy of his company and was authorized to write insurance under the blank policy, nevertheless, in writing it for the amount that he had, without first consulting him, he considered that he had gone beyond what he should have done. Now, Mr. Bigham did not say that the insurance was unauthorized. He simply told me: 'I don't say it is unauthorized, because Mr.

Owens has a blank policy, and is authorized, in ordinary cases, to write insurance, and we are very glad to give it to him; but in this particular case I think he has written too much, not only for the company, but for your sake.' * * * Mr. Bigham told me specifically that while he did not claim the issuance of the insurance to be unauthorized, yet he considered the amount written by Owens too large for us to accept in any one company, or for his own company to carry for Owens, or for anybody else. * * * I do not believe that at the first interview with me—and we had several—Mr. Bigham said anything about reinsurance. At subsequent interviews, I asked Mr. Bigham whether he could not secure reinsurance with other companies, and he told me then that he had tried, but that his endeavors along in that direction had not been successful, or not very successful. Later on, of course, I learned that some of the insurance had been placed in another company or companies, but I have forgotten what proportion of it. * * * Mr. Bigham told me about this, and he told me several times; he did not tell me only once he did not want me to understand that Owens exceeded his authority, but merely that Owens committed an act which was, perhaps, not strictly correct, in writing such a large amount of insurance without previously consulting the company with regard to that. * ·. * "

In the second deposition the witness stated:

"I believe Mr. Bigham did tell me at one time that he had tried to get reinsurance on this Dacia cotton, but had not succeeded. In answer to my suggestion about obtaining the insurance, he stated that he had endeavored to get some, but found it impossible. The impression he created in my mind was that, if he had any reinsurance at all, it was a very insignificant amount. * * * Mr. Bigham told me that while Owens had a blank policy of insurance, under which he could write out insurance to any amount he deemed wise to do so, nevertheless he thought Mr. Owens had exceeded his authority in having so large an amount, thus endangering the Providence-Washington, as well as the Guaranty Trust Company, in the event of a loss of the steamer."

[1-4] The appellee justifies the admission of this testimony on the ground that through the introduction of the deposition of the witness Bigham, who denied making any statement to May to the effect that the act of plaintiff in issuing the certificates in the amount stated was unauthorized, and that the defendant company had no reinsurance upon the shipment; and, also, by reason of the cross-interrogatories propounded to the witness May by the defendant, in which cross-interrogatories quotations were made from the first deposition and the witness was asked if he had not made those statements, which he acknowledged, and which he stated to be true—that the defendants sought to show that the witness had fabricated his testimony contained in the last deposition with reference to these two issues. We do not understand that such facts would justify

the introduction of this character of testimony, of which complaint is made in this group of assignments. While appellant cites a number of authorities in support of the proposition that the testimony attacked was inadmissible for the purpose of impeachment, we do not deem it necessary to discuss the rule of evidence· discussed in those authorities, because appellee disavows any intention to impeach his own witness, and relies alone for the claimed admissibility of this character of testimony on the theory that it was admissible for the purpose of fortifying the testimony given in the second deposition, for the claimed reason that appellant had sought to impeach plaintiff's witness May and to show that his testimony in the second deposition was fabricated. As is stated in Insurance Co. v. Eastman, 95 Tex. 34, 37, 64 S. W. 863:

"Upon the subject of admitting the testimony of the former declarations of a witness in support of his testimony given upon the trial, there is a great contrariety of opinion as to the circumstances which render such admission proper. But two rules are reasonably well established: (1) That in the absence of evidence impeaching the credibility of a witness, such testimony is never admissible. Moody v. Gardner, 42 Tex. 414. (2) That whenever a witness is sought to be impeached by showing that he has made declarations inconsistent with the testimony given by him upon the trial and the tendency of such impeaching evidence is to show that the testimony of the witness is, by reason of some motive existing at the time of the trial or of some influence then operating upon him, fabricated, it is proper to admit evidence of his former declarations which corroborate his testimony, provided such declarations were made at a time when no such motive or influence existed."

**[5-7]** The fact that the testimony of the witness May was contradicted by the testimony of Bigham, the other party to the conversation in question, would not make this character of evidence admissible for the purpose intended·or for the purpose of showing that in fact Bigham had made the statements to May as testified to by May in his second deposition. Mere conflict of evidence will not justify the admission of this character of testimony. Newton v. Alexander, 44 S. W. 416, writ denied. In this case the court says:

"The general rule is that evidence of what a witness has said out of court cannot be received to sustain or fortify his testimony. To this general rule, however, there seems to be a well-recognized exception, viz., that where an effort is made to impeach the credibility of a witness by evidence imputing a design to misrepresent from some motive of interest, or that by reason of some influence operating upon him at the time his testimony is a fabrication, it is proper, in order to repel such imputation, to admit evidence of his former declarations which corroborate his testimony; provided such declarations were made at a time when no such

motive or influence existed. Insurance Co. v. Eastman, 95 Tex. 34 [64 S. W. 863]; Lewy v. Fischl, 65 Tex. 311. But it is no ground for the introduction of such declarations that other witnesses have merely contradicted the witness sought to be sustained by testifying to a different state of facts. 1 Greenleaf on Evidence, 469; 3 Jones on Evidence, 871."

Nor would it be admissible to introduce prior unsworn statements of the witness May to explain conflicts, in the testimony of said witness, between the testimony contained in the first and the second deposition. G., C. & S. F. Ry. Co. v. Sullivan, 190 S. W. 739. Plaintiff below offered both depositions, and therefore vouched for the credibility of the witness as to both depositions. In the second deposition, on cross-examination, the witness admitted that he made the answers contained in the first deposition and about which he was asked. We think there can be no question as to the inadmissibility of this testimony, and we are further of the opinion that material error was committed in admitting said evidence over the objections of the defendant. The plaintiff in open court elected to rely on his two allegations contained in his petition, to wit: (1) That Bigham had stated to May that the issuance of the certificates in the amounts stated was unauthorized; and (2) that defendant had no reinsurance on the shipment. There was a sharp conflict presented as to whether or not this statement had been made by Bigham, and to admit this character of testimony in an effort to fortify the version of what occurred between May and Bigham on the occasion of the conversation, and as testified to by May in his second deposition, was of a nature reasonably calculated to mislead the jury into believing that they could accept the testimony of Owens, Harrison, Parker, and others as to what May had told them as evidence that Bigham had in fact made the statements complained of to May. For this error the judgment must be reversed and the cause remanded.

**[8, 9]** Under its eighteenth assignment, appellant urges error in the court's failure to give its special charge peremptorily instructing the jury to find for the defendant, on the ground that there was no evidence of sufficient probative force to authorize the submission to the jury of the issue of defendant's representative making the alleged statement to the effect that the issuance of certificates of insurance was unauthorized. While we agree with appellant that the testimony, to the admission of which the first seventeen assignments are directed, was inadmissible for any purpose disclosed in the hearing, and most certainly was it inadmissible for the purpose of showing that the statement imputed to Bigham had in fact been made (T. & P. Ry. Co. v. Johnson, 90 Tex. 304, 38 S. W. 520), yet we are of the

opinion that the testimony of May as given in his second deposition does make it a question for the jury as to whether in fact the statements imputed to Bigham were made or not. Under this assignment, it is urged that there is no evidence to show, even though it be admitted that Bigham did make the statements imputed to him, that in so doing he was acting as the agent and representative of the defendant, or that he was so authorized by the defendant, or that it was within the actual or apparent scope of his agency to make said statements. It is in evidence that Mr. Bigham and his firm acted as the attorneys of the defendant company in the Dacia matter, and that they had no other attorneys; that the president of the defendant company stated that it was his understanding that Bigham was "to keep in touch with what was occurring on this shipment, in which we were so vitally interested." Seibels testified that Branch, president of defendant, wired and telephoned him that he had employed Bigham's firm in the Dacia matter, and instructed him to call on the Guaranty Trust Company. Branch further testified he instructed Bigham on January 22d "to explain our position with the Guaranty Trust Company, which he did in his letter of January 26 (25), 1915." The test of the liability of the principal is, not whether the agent was authorized to do the particular thing which constituted the wrong complained of or caused the injury for which recovery is sought, or whether it was done in violation of the principal's orders, but whether it was done while he was engaged in his principal's business and within the apparent scope of his authority. Jackson v. Walls, 187 S. W. 676; Ry. Co. v. Neel, 26 S. W. 788, in which Story on Agency, § 452, and Mechem on Agency, § 734, are cited. In the last-cited case it is further said:

"The master who puts the servant in a place of trust or responsibility, or commits to him the management of his business or the care of his property, is justly held responsible when the servant, through lack of judgment or discretion, goes beyond the strict line of his duty or authority, and inflicts an injury on another. As to whether the acts complained of were within the scope of the agent's employment is a question of fact to be determined by the jury."

Hence we overrule the eighteenth assignment.

[10-12] Under special issue No. 17, the court submitted the question of injury to plaintiff's credit, standing, and reputation in the cotton trade and in the business world among bankers engaged in financing cotton transactions, as a proximate result of the act of Bigham in inducing the Guaranty Trust Company to delay the sailing of the Dacia, and in connection with the submission of this issue instructed the jury that

if they should believe that Bigham did state to May, vice president of the trust company, that the issuance by Owens of the insurance certificates against the Dacia cargo was unauthorized, and they should further find that said statement was untrue, and that in making it said Bigham was actuated by malice, then said statement was in law slanderous, and in such a case the law presumes damage to the person slandered and does not require him to prove how or to what extent such damage was suffered; hence, if they should so find, and should further find that there was no proof as to what amount, if any, plaintiff was damaged in this respect, yet they would be authorized to find such an amount of damage as the jury believed from the nature and circumstances of the case resulted to Owens from the speaking of said words by Bigham. To the giving of this instruction, over objection, the twentieth assignment is directed. The court evidently, by so instructing the jury, concluded that the words imputed to Bigham were actionable per se, and therefore it was not incumbent upon plaintiff to allege or prove any special damage. 25 Cyc. 959, on S. & L. But defamatory words to be libelous per se must be of such a nature that the court can presume as a matter of law that they will tend to disgrace and degrade the party or hold him up to public hatred, contempt, or ridicule, or cause him to be shunned and avoided. 25 Cyc. 253, and cases cited. In Zeliff v. Jennings, 61 Tex. 458, 466, the Supreme Court, speaking through Justice Stayton, says:

"There is some conflict of opinion as to the character of crime which must be imputed by words to make them actionable per se. We have not the time or disposition to review, in this opinion, the cases bearing on this question, but we believe that the great weight of authority establishes the proposition that: An accusation is actionable whenever an offense is charged which, if proved, would subject the accused person to a punishment, though not such as is known in the books, technically, as an ignominious punishment, if the accusation be such as to bring disgrace on the person of whom the words are spoken; words which impute to the person of whom they are spoken a character, a moral turpitude, which would exclude him from association with respectable persons. Character for moral turpitude bars the doors of society against its possessor, as completely as could a charge against one of having the most loathsome disease, which is held to be actionable per se; and it is difficult to see, if the one be actionable per se, why the other should not be."

In 25 Cyc. 249, it is said:

"General damages are those which the law presumes must actually, proximately, and necessarily result from the publication of the defamatory matter. The latter arise by inference of law and are not required to be proved by evidence and are allowable whenever the im-

mediate tendency of the words is to impair plaintiff's reputation, although no actual pecuniary loss has in fact resulted; the words from which the law presumes injury in such case being deemed actionable per se. All other defamation is actionable per quod, that is, special damages must be alleged and proven."

But it has been held that written or printed publication, which does not attack the veracity of the party against whom it is made, but merely charges a mistake in judgment, is not libelous per se, as such a charge does not effect the reputation of the party. See cases cited in 25 Cyc. p. 256, under subnote 42, including the case of Sanders v. Hall, 22 Tex. Civ. App. 282, 55 S. W. 594. While in some cases it has been held that the publication of a charge that a person has been guilty of a breach of trust or a betrayal of confidence is libelous per se (see Mosnat v. Snyder, 105 Iowa, 500, 75 N. W. 356; McDuff v. Journal Co., 84 Mich. 1, 47 N. W. 671, 22 Am. St. Rep. 673; Carpenter v. Hammond, 1 N. Y. St. Rep. 551; Stewart v. Pierce, 93 Iowa, 136, 61 N. W. 388; Manget v. O'Neill, 51 Mo. App. 35; Tryon v. Evening News, 39 Mich. 636; Lauder v. Jones, 13 N. D. 525, 101 N. W. 907), yet, if the words alleged to be slanderous are capable of an innocent meaning as well as a defamatory one, there should be in plaintiff's petition an averment and innuendo showing that, not only had the defendant used the words in a defamatory sense, but that the hearer or hearers understood the language as conveying the alleged defamatory meaning. In view of the peculiar state of the evidence disclosed by the two depositions of Max May as to what Bigham did in fact state to him, and taking May's testimony as a whole, we are of the opinion that upon another trial, if the evidence be in the same condition with respect to this matter, the court would not be authorized to assume as a matter of law that, even though the jury should find that Bigham did make the statement that the issuance of the certificates of insurance by Owens was unauthorized, thereby said Bigham intended to charge Owens with any offense or any act involving moral turpitude or to charge him with any act reflecting on his business integrity, or which would be reasonably calculated to impair his business standing. It would seem that May understood Bigham to state that Owens, in issuing the certificates, had merely exceeded, under all the circumstances, the large discretion vested in him, rather than to charge Owens with an abuse of authority to issue the certificates.

For the reasons given, we are of the opinion that under the facts of this case the instruction given by the court, of which complaint is made under this assignment, was erroneous. As is said in the case of Knapp v. Campbell, 14 Tex. Civ. App. 199, 36 S. W. 765, by the San Antonio Court of Civil Appeals:

"But to sustain an action for libel the plaintiff must either show special damage, or 'the nature of the charge must be such that the court can legally presume he has been degraded in the estimation of his acquaintances or of the public, or has suffered some other loss, either in his property, character, or business, or in his domestic or social relations, in consequence of the publication.'"

See Odgers, S. & L. p. 18; Cooley, Torts, p. 240 (206); Zeliff v. Jennings, 61 Tex. 458; Publishing Co. v. Jones, 83 Tex. 302, 18 S. W. 652; Hirshfield v. Bank, 83 Tex. 457, 18 S. W. 743, 15 L. R. A. 639, 29 Am. St. Rep. 660; Belo v. Fuller, 84 Tex. 450, 19 S. W. 616, 31 Am. St. Rep. 75; Belo v. Wren, 63 Tex. 686. If the words used are not reasonably susceptible, in the connection in which they are used, of any defamatory meaning, it is the duty of the court to so instruct the jury as to give proper effect to that rule of law. As said by Mr. Newell, in his work on Slander & Libel:

"A word at the end may alter the whole meaning; so, if in one part appears something to the plaintiff's discredit, in another, something to his credit, the 'bane' and the 'antidote' should be taken together. The law does not dwell on isolated passages, but judges of the publication as a whole."

See Guisti v. Tribune, 105 Tex. 507, 150 S. W. 874, 152 S. W. 167.

[13] We are of the opinion that damages would not be recoverable in this cause for alleged loss of profit on business other than the particular shipment in question. Plaintiff testified that it would be a difficult question to estimate the amount of profits that he would have made during the nine days of the Dacia tie-up, but that he had in mind certain business to which he would have given his attention if his time had not been occupied in the effort to secure a settlement of the controversy with reference to the Dacia shipment, and that this estimate of the profits that he would have made was that it would have been from $25,000 to $40,000. The defendant reserved a bill of exception to the introduction of this testimony, as shown in the twenty-first assignment. The jury rendered a verdict as to this item in the sum of $10,000, the full amount alleged by plaintiff in his pleadings. We are of the opinion that the objection should have been sustained. This loss or damage is not sought to be recovered on the ground that by reason of the circulation of the alleged slander plaintiff was injured among bankers and cotton dealers, and that such persons by reason thereof refused to deal with him or extend him credit or other accommodations, but that the loss arose out of the fact that his time was so fully occupied with attempting to straighten out the

tangle in which the matter of the shipment had gotten, that he had no time to devote to other business. Therefore, so far as the facts of this case are concerned, we are of the opinion that the same measure of damages should obtain as was applied by the Supreme Court in O'Connor et al. v. Smith et al., 84 Tex. 232, 237, 19 S. W. 168, 170. In that case plaintiffs sued to recover damages for breach of contract on the part of defendants, alleging that plaintiffs had contracted with defendants to do certain work and alleged that defendants breached the contract and refused to allow plaintiff to perform the work. Plaintiffs sought as a part of their cause of action to recover damages in the way of profits that they would have made on other contracts, and the Supreme Court approved the statement of the law as made by the appellants therein in the following words:

"Where a contractor has been allowed to perform under his contract the work agreed to be done by him and has received the contract price therefor, but has been unreasonably hindered and delayed in its performance by the fault of the other party, he cannot recover as damages for said hindrance and delay the profits that he might have made by his business or calling on other work if he had not been so delayed."

The court further said:

"We think the proposition correctly states the law, and that the evidence objected to should have been excluded. The profits that may be considered in giving damages for a breach of contract are such only as are the direct and immediate fruits of the contract entered into between the parties to it. 'They are presumed to have been taken into consideration and deliberated upon before the contract was made, and formed perhaps the only inducement to the arrangement.' But the loss of profits that may result from collateral enterprises are regarded as too remote to be considered. 1 Suth. on Dam., 115."

See Cates v. Sparkman, 73 Tex. 619, 11 S. W. 846, 15 Am. St. Rep. 806; Elmendorf v. Classen, 92 Tex. 472, 49 S. W. 1043; Newell on S. & L. (3d Ed.) § 1069, p. 1110.

Appellee cites several cases to sustain the recovery as to this item of damages, among which are Raymond v. Yarrington, 96 Tex. 443, 72 S. W. 580, 73 S. W. 800, 62 L. R. A. 962, 97 Am. St. Rep. 914, and Welsh v. Morris, 81 Tex. 159, 16 S. W. 744, 26 Am. St. Rep. 801. In the first-cited case, suit was brought by Raymond against Yarrington and others for alleged breach of contract, by the terms of which one of the defendants and his partner had agreed with plaintiff not to enter into or conduct a similar business in certain designated territory without the written permission of plaintiff. It was alleged that defendants had breached this contract and had entered into a similar business in said territory. In reversing a judgment for defendant, the Supreme Court said:

207 S.W.—43

"We are also of the opinion that the court erred in instructing a verdict for the defendant Harwood. The charge is as follows: 'In this case there is no evidence tending to show what part of the decrease in the business of Raymond & Bro. below that done by Harwood & Yarrington was caused by the competition of Harwood, if any, in violation of his contract, what part was due to * * * other competition than houses represented by Harwood, or what part was due to lack of experience in the business on the part of Raymond & Bro., as compared with Harwood & Yarrington. * * * The jury will therefore return a verdict for the defendant.' In view of the fact that the case will be remanded for a new trial, we must refrain from discussing the testimony. We may say, however, that the evidence does not show how much, if any, the plaintiff was damaged; and it may be that if, under the testimony and a proper instruction, the jury had given only nominal damages, the court should not have disturbed the verdict. From the nature of the case it is impossible to show the damages with accuracy, and to require accuracy in such a case would be to deny a remedy for a wrong. In Welsh v. Morris [81 Tex. 159, 16 S. W. 744, 26 Am. St. Rep. 801], previously cited, a judgment for substantial damages was sustained upon testimony quite as unsatisfactory, to say the least of it, as that introduced in the present case."

[14] It will be noted that in the last-cited case the suit was predicated upon an alleged breach of contract on the part of defendant not to engage in a rival business within the designated territory, and hence it is evident that the parties to the contract had in mind, at the time of the making thereof, the very character of damage which plaintiff sought to recover for in the suit. It is patent that both parties to the contract understood that the entrance on the part of the defendant into a business similar to that which he had sold to plaintiff would injure plaintiff by reason of curtailing his business and decreasing his profits. But it is not so in the instant case. In the English case of Ratcliffe v. Evans, 2 Q. B. 524, also cited by appellee, it was held that in a case of libel not actionable per se, but false and intended to cause damage, evidence of general loss of business was admissible, without specific proof of the loss of any particular customers or orders, and was sufficient to sustain the action. To use the very words in appellee's brief, there were two grounds for recovery stated in plaintiff's petition: "(1) Wrongful interference with contractual relations, and (2) slander." As the character of plaintiff's testimony, as before noted, excludes the conclusion that the loss to plaintiff as to profits he would or might have made on other business caused directly by the publication and circulation of the slander, plaintiff must rely, if at all, as to this item, upon his claim for damages arising by reason of the interference of defendant with the contractual relations existing between plaintiff and the

Guaranty Trust Company. We do not mean to say that if the evidence reasonably supported the conclusion that loss was sustained by plaintiff by reason of the alleged statement of Bigham to Max May, in the way of profits on the shipment in question, that plaintiff would not be entitled to recover therefor. But we are of the opinion that, as to profits on other business, such evidence is too remote and speculative, and such loss does not proximately result from the words alleged to have been spoken. Complaint is also made as to the admission of the testimony of plaintiff with reference to his mental distress, for which the jury awarded him the substantial amount of $25,000. Some of this anxiety or distress which the plaintiff testified he suffered was caused by his fear or knowledge that, in case the contract between him and the Guaranty Trust Company should not be consummated by the terms of which contract the trust company had agreed to finance the shipment, that he would not be able to pay the freight and other expenses, and, further, by the fear that the buyers of the cotton included in the shipment would have a right to recover from him for his failure to deliver the same. Without holding that the objection to the testimony as a whole should be sustained because certain portions of the testimony were inadmissible, in view of another trial, we will say that in our opinion plaintiff would not be entitled to recover for any mental distress which was not the direct result and proximate effect upon his mind and feelings of the alleged libelous slanderous statement. Pullman Palace Co. v. McDonald, 2 Tex. Civ. App. 322, 21 S. W. 945; Jones v. T. & N. O. Ry., 23 Tex. Civ. App. 65, 55 S. W. 371; Turner v. Hearst, 115 Cal. 394, 47 Pac. 129.

[15, 16] By another group of assignments objection is made to the submission of a number of special issues of fact. Without attempting to discuss the assignments under this group separately, we will content ourselves with stating that in our opinion, under the state of facts disclosed, a recovery ought not to be sustained upon the mere finding by the jury that Bigham stated to Max May that the issuance of the certificates of insurance against the Dacia cotton was unauthorized, and that the defendant company had no reinsurance on the Dacia cotton. The jury might find, in spite of the somewhat contradictory testimony of Max May in his depositions, that Bigham did make to said May both of said statements, and yet believe and be able to further find, in view of the whole conversation between Bigham and May, that Bigham did not intend to charge, and May did not understand him to charge, that Owens had been guilty of any wrongful conduct or breach of good faith, but merely had failed to exercise the conservative discretion which the defendant had the right to expect and did expect of him. Also, the jury might find that Bigham did state that the defendant had no reinsurance on the Dacia shipment; but, in view of Max May's testimony alone, the jury might reasonably find that in so stating Bigham did not intend, nor did Max May understand, that no reinsurance had been obtained, that Bigham intended to state, and May understood him to state, in effect, that the reinsurance obtained was limited in its amount, and did not constitute any substantial protection either to the defendant or to the Guaranty Trust Company. As before stated, May testified, in the very conversation in which it is claimed these two slanderous statements were made, that he (Bigham) did not wish to be understood as saying that plaintiff was not authorized, under his blank policy, to write insurance in any amount, but that he merely intended to say that in this particular case plaintiff had committed an act which was perhaps not strictly correct in writing so large amount of insurance without previously consulting the company with regard to it. As is said by Mr. Newell, in his late work on slander (section 368), in determining this question:

"The words spoken as a whole should be considered without dwelling on isolated passages, and every part should be given its proper weight."

The language alleged to be defamatory must be construed as a whole; that is, the words must be construed in connection with other parts of the conversation or proof made, written, or printed.

[17] Under the 113th assignment, complaint is made of the refusal of the court to submit the following issue:

"Did Henry J. Bigham have authority from the Providence-Washington Insurance Company to make a statement to Max May to the effect that the certificates were unauthorized?"

If the evidence as to the authority of Bigham to act for and bind the defendant company in the next trial be of a character similar to the evidence in this trial, we are of the opinion that this issue tendered in the last trial should be given.

[18] We are also of the opinion that the court should have submitted defendant's special issue No. 10, as follows:

"Was the refusal of the Guaranty Trust Company to permit the Dacia to sail between January 21 and 30, 1915, due to the fact that it would not accept marine certificates for so large an amount in any one company, regardless of whether that company was reinsured or not, and regardless of any notification, if any, that the certificates were unauthorized?"

On January 21st the Guaranty Trust Company wired Owens as follows:

"Notice that all your marine insurance is covered by Providence-Washington Insurance Com-

pany. This not satisfactory to us. Insurance should be covered by a number of different companies approved by us. Further, government war insurance is not settled yet. Until all these questions are disposed of, sailing Dacia out of question."

Owing to the fact that the evidence leaves it somewhat in doubt as to whether the contract between the defendant and the Rossia Insurance Company (under which contract the last-named company had agreed to accept for reinsurance two-thirds of each and all the insurance risks taken by the defendant company) was operative at the time of the insurance of these certificates and at the time of the conversation between Bigham and May, or had been conditionally withdrawn, and owing to the fact that May in one place testified that he did not understand Bigham to say that the issuance of the certificates was unauthorized under the contract existing between the defendant company and Owens, and owing to the fact that May testified that if he had known the risk on the Dacia cotton was being carried one-third by the defendant and two-thirds by the Rossia Insurance Company he would not have allowed the Dacia to sail, and owing to the fact that L. A. Wight & Co., plaintiff's agent, wired plaintiff of January 24, 1915, that the refusal of the Guaranty Trust Company to accept the Providence-Washington Insurance Company certificates was not based on the latter's notification that the certificates were unauthorized, but was based on the trust company's statements that it would not accept marine certificates for so large an amount from any company whatever, regardless of whether reinsured or not, we think the issue tendered should have been given.

[19] We are also of the opinion that error was committed as claimed in the 121st assignment, in the admission of a telegram from L. A. Wight & Co., plaintiff's agent to plaintiff, in which message it was stated in substance that the trust company had notified the sender that the defendant had notified the trust company that the marine certificates were unauthorized, and that defendant had no reinsurance on the Dacia. We think said testimony was hearsay and self-serving, and not binding upon the defendant.

Assignments other than those mentioned need not be discussed, as they involve principles of law similar to those involved in assignments already discussed, or present questions not likely to arise on another trial or concern matters which it will be fruitless to discuss in view of another trial, such as the alleged excessiveness of the verdict with reference to various items of damages, etc.

For the reasons given, the judgment of the trial court is reversed, and the cause re-manded for further proceedings not in conflict with this opinion.

Reversed and remanded.

CONNER, C. J., not sitting, serving on writ of error committee at Austin.